[No. B155958. Second Dist., Div. Five. Apr. 29, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
DARRYL DORRELL TATUM, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

_____

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts 2. and 3.

290

## COUNSEL

Brett Harding Duxbury, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Susan D. Martynec and Alan D. Tate, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**ARMSTRONG, J.**—Appellant Darryl Dorrell Tatum was convicted, following a jury trial, of one count of attempted murder in violation of Penal Code sections 187 and 664, one count of assault with a deadly weapon in violation of section 245, subdivision (a)(1) and one count of infliction of

injury on a dependent elder in violation of section 368, subdivision (b)(1). The jury found that in the commission of all three offenses, appellant personally inflicted great bodily injury within the meaning of Penal Code section 12022.7, subdivisions (a) and (c) and personally used a deadly and dangerous weapon within the meaning of section 12022, subdivision (b)(1). The jury also found true the allegation that the victim suffered great bodily injury within the meaning of Penal Code section 368, subdivision (a)(2).[1]

In the published portion of this opinion, we consider appellant's contention that the trial court erred in admitting the videotaped statement of the deceased victim pursuant to the elder and dependent adults exception to the hearsay rule set forth in Evidence Code section 1380. In the unpublished portion of this opinion, we consider appellant's claims that the trial court erred in failing to instruct the jury on the lesser offense of voluntary manslaughter and on the requirement of unanimity. We affirm the judgment of conviction.

## Facts

Willie Smith lived with his bed-ridden, Alzheimer's-stricken, wife in their home at 227 West 41st Street, in the City of Los Angeles. Smith was 82 years old in March 2001, when he was the victim of the crimes in this case. Smith died of natural causes before the trial of this matter.

The Smiths needed assistance with their daily living activities. In March 2001, this assistance was provided by Annie Dinkins and appellant, sometimes together and sometimes separately. Dinkins described Smith as "difficult" at times. She testified that Smith and appellant got along "fairly well." The two did have disagreements from time to time, and they debated certain issues. She never saw them get physical with each other. The two had a close relationship and Smith cared about appellant.

On Monday, March 19, 2001, about 8:45 a.m., Dinkins called Smith and told him she would arrive late that morning. Smith sounded normal on the telephone. When Dinkins arrived about 9:05 a.m., Smith's white van was not there and she found Smith on his knees slumped over in his living room recliner, bleeding, with "a big hole in the center of his head." There was blood in the dining room and a hammer and shovel were on the table. Smith

---

[1]The trial court sentenced appellant to a total term of 15 years in prison, consisting of the upper term of nine years in state prison for the attempted murder conviction plus five years for the great bodily injury enhancement and one year for the weapon enhancement. The court stayed sentence on the Penal Code section 245 and 386 convictions pursuant to section 654. The court also imposed a $2,000 restitution fine pursuant to Penal Code section 1202.4 and a parole revocation fine of $2,000, stayed, pursuant to section 1202.45.

was known to maintain large amounts of cash in his home or on his person, but Dinkins had no way of knowing if any was missing.

Dinkins asked Smith who did it to him, and he said that he did not know. Dinkins did not think he was being truthful. Dinkins tried to call 911 on the house telephones, discovered that they were not working, and called 911 on her cellular telephone.

Smith was taken to the hospital. The police investigated the scene of the attack. There was splattered blood in the dining room, the dining room furniture was overturned, and there was a broken clock, broken iron skillet, and bloody hammer on the floor. The recliner in the living room had large bloodstains on it. There were two bloody towels on the floor. Nearby, a striped shirt bearing a large bloodstain, and later determined to belong to appellant, was found on the floor. A fireplace shovel was found on the kitchen table and it appeared to have dried blood on it. Mrs. Smith was still in her bedroom, but in no condition to understand or relate what had happened to Mr. Smith.

At the hospital, Smith was examined and underwent numerous tests. It was determined that he suffered from numerous focused blunt force injuries to his head resulting in a complex depressed skull fracture and numerous lacerations to the sides and rear of his scalp with bleeding in his brain. The injuries were consistent with having been caused by the hammer recovered at the scene. Ultimately, Mr. Smith underwent a complicated surgery on March 20, 2001, during which doctors reconstructed his skull with two titanium plates.

Los Angeles Police Detective Jerry Code spoke to Mr. Smith in the hospital later on the day of the attack and prior to the surgery.

Police attempted to locate appellant but were unable to do so.

Two days after the attack, Arizona Department of Public Safety officers discovered appellant sleeping in the back of a white van reported stolen from Mr. Smith's house. Appellant was arrested, and the shirt, pants, and boots that he was wearing were confiscated. Employees of the Arizona office of the Federal Bureau of Investigation processed the white van and messengered appellant's clothing and other material to the Los Angeles Police Department. Appellant was extradited back to Los Angeles.

Blood was found on the shirt, pants, and boots that appellant was wearing when he was arrested. Criminologists compared that blood, and blood from

the shirt and hammer recovered from Smith's residence with DNA samples taken from both Smith and appellant. The criminologists, who were experienced with DNA processing and analysis, concluded that the DNA of the blood found on all these items matched Smith's DNA.

On April 24, 2001, senior district attorney investigator Joseph Kay interviewed Smith for about two hours at his nursing home and videotaped the entire interview.[2] During this interview, Smith was confused about some matters, but maintained that it was appellant who attacked him with a hammer. Smith was unable to select appellant's photograph from a six-pack photographic line-up, but identified appellant in a larger photograph. Also during this interview, Smith maintained that he and appellant had not argued or fought before the attack, and repeatedly expressed confusion about this incident because he thought appellant was his best friend.

Appellant testified on his own behalf at trial and denied inflicting injury on Smith. Appellant stated that he was in the house earlier in the morning, but went outside to work on Smith's van when Smith answered the telephone. The van was parked on the street about two houses away, and appellant worked on it for about 15 minutes. Appellant returned to the house within 20 minutes of when he last saw Smith and was shocked to find him lying on the dining room floor with his head all bloody. Appellant asked Smith what had happened, but Smith said that he did not know.

Appellant helped Smith turn over, and then helped him up into his recliner. Appellant gave Smith a towel for the blood on his face, but did not notice the severe injury on the top of his head. Appellant tried to call for help using the telephones, but discovered they were not working. Smith made a comment about his money, and appellant noticed that a filing cabinet in the dining room area was open.

Appellant looked around for a telephone. The cordless telephone was missing and the telephone in Mrs. Smith's room did not work. Smith's head went sideways, and he did not respond when appellant called his name. Appellant became concerned that Smith was dead.

Appellant noticed he had a large bloodstain on his shirt, so he took it off and dropped it on the floor. Appellant put on one of Smith's shirts, and walked out the front door of the house to the van. Appellant "[d]idn't want to get caught up in that."

After appellant left the house, he did not try to call the police or an ambulance. He drove to San Diego, where he stopped and bought gasoline.

---

[2] A transcript of this interview was provided to each juror when the videotape was played during trial, and a copy of this transcript is contained in the clerk's transcript.

He then headed east and stopped in El Centro to call his wife and to get gasoline, oil, and transmission fluid. In Maricopa County in Arizona, the van broke down. He had the van repaired at a local garage for $37.

Appellant then decided to return to California. As he got close to the California border, the van started to overheat. Appellant stopped the van and went to sleep in the back. The next thing he remembered was being awakened by police outside the van. According to appellant, the officers pointed guns at him and he cooperated with their requests to exit the van. Appellant was arrested, had $89 confiscated from him, and was taken to the station.

Appellant acknowledged that Smith could be "difficult" at times. However, appellant was used to Smith's mood swings, always got along well with Smith, and had no problems with him at all. According to appellant, on the morning of the attack, Mr. Smith had been teasing appellant about how much money appellant was spending on a crib for his new grandson. Far from having any actual disagreement or argument, Mr. Smith reached into his wallet, pulled out $100, and gave it to appellant.

Appellant admitted that Smith had tried to evict appellant and his family from their home, which they rented from Smith, four times over the previous five years, with the last time being in December of 2000. That latest eviction proceeding was dismissed, and according to appellant, he continued to work for, and be paid by, Smith throughout this period without problem.

Appellant also called Detective Code as a defense witness, to testify about Code's interviews of Smith. Detective Code spoke for the first time to Smith in the hospital on the afternoon of March 19, 2001, and asked him if he had any previous arguments with appellant. Smith said no. When asked if appellant hit him that morning, Smith said repeatedly, "I don't know." Smith said he was home with his wife and appellant when someone struck him on the head and then tried to choke him. Smith said that the only people in the house at that time were his wife and appellant. Detective Code admitted using appellant's name, Darryl Tatum, during the interview.

Detective Code spoke to Smith again on March 21, 2001. When asked if appellant hit him, Smith said that appellant hit him in the head, they got into a scuffle, and then appellant nearly choked him to death. During the scuffle, appellant asked Smith where his "big money" was. Detective Code tried to tape-record another interview later that day, but Smith had been medicated and was less coherent.

Detective Code interviewed Smith a fourth time on April 5, 2001. During that interview, Smith said appellant hit him with a hammer, tried to choke

him, and asked him where his money was. Smith was perplexed as to why this happened because he expressly thought he and appellant were good friends. Smith did say, however, that he was trying to evict appellant because he was behind in his rent. During a fifth interview on April 20, 2001, Smith was unable to select appellant's photograph from a six-pack photographic lineup, but was able to identify appellant in a larger photograph.

*Discussion*

1. *Evidence Code³ section 1380*

Mr. Smith died of natural causes before the trial of this matter. Pursuant to the elder abuse and dependent adults exception to hearsay evidence set forth in section 1380, the trial court admitted the videotape of district attorney investigator Kay's interview of Mr. Smith. The interview was conducted about a month after the attack, while Mr. Smith was in a nursing home recovering from the attack. ■■■ Appellant contends that the trial court's admission of this videotape statement was prejudicial error because it was untrustworthy and therefore not reliable. He also contends that the admission of the tape violated his federal constitutional right to confront the witnesses against him.

a. *Section 1380*

Section 1380 provides that "[i]n a criminal proceeding charging a violation, or attempted violation, of Section 368 of the Penal Code, evidence of a statement made by a declarant is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness, as defined in subdivisions (a) and (b) of Section 240," and a number of requirements are met. (§ 1380, subd. (a).)

■■■ The United States Supreme Court has determined that the introduction of reliable hearsay evidence in a criminal case does not violate either due process or the right to confront and cross-examine witnesses. (*Idaho v. Wright* (1990) 497 U.S. 805, 819-820 [110 S.Ct. 3139, 3148-3149, 111 L.Ed.2d 638]; *In re Lucero L.* (2000) 22 Cal.4th 1227, 1243-1244 [96 Cal.Rptr.2d 56, 998 P.2d 1019].) Indicia of reliability are "particularized guarantees of trustworthiness" concerning the hearsay statement and the totality of circumstances that surround the making of the statement that render the declarant particularly worthy of belief in making its determination of trustworthiness. (*Idaho v. Wright, supra,* 497 U.S. at p. 820 [110 S.Ct. at p. 3149].)

---

³All further statutory references are to the Evidence Code unless otherwise specified.

Section 1380 satisfies this constitutional requirement because it requires that hearsay evidence cannot be admitted unless "The party offering the statement has made a showing of particularized guarantees of trustworthiness regarding the statement, the statement was made under circumstances which indicate its trustworthiness, and the statement was not the result of promise, inducement, threat, or coercion. In making its determination, the court may consider only the circumstances that surround the making of the statement and that render the declarant particularly worthy of belief."

■ A trial court's determination regarding whether a hearsay statement has the required indicia of reliability is subject to independent review on appeal. (*Lilly v. Virginia* (1999) 527 U.S. 116, 136 [119 S.Ct. 1887, 1899-1900, 144 L.Ed.2d 117]; *People v. Eccleston* (2001) 89 Cal.App.4th 436, 445-446 [107 Cal.Rptr.2d 440].) A trial court's finding of historical fact must be upheld if supported by substantial evidence. A trial court's determinations of state law issues are also reviewed for an abuse of discretion. (*Lilly v. Virginia, supra,* 527 U.S. at p. 136 [119 S.Ct. at pp. 1899-1900].)

A principal requirement of "trustworthiness" is that the declarant's statement must be true. In *Wright,* the United State Supreme Court gave as an example of circumstances which surround the making of the statement and which guarantee trustworthiness, the "excited utterance" exception, where it is highly unlikely that the speaker had an opportunity to fabricate or be coached because of the closeness in time between the occurrence and the statement. As an example of circumstances which render the person unlikely to lie, the court pointed to the "dying declaration" and "medical treatment" exceptions, which are based on the belief that persons making such statements are highly unlikely to lie because lying would be against their spiritual or physical self-interest. (*Idaho v. Wright, supra,* 497 U.S. at p. 820 [110 S.Ct. at p. 3149].)

■ The trial court found Smith did not have "the state of mind to fabricate." Independently reviewing the totality of the circumstances in light of *Wright,* we agree that the circumstances surrounding the making of the statement rendered Smith unlikely to lie. There is no evidence tending to show that Smith would lie or had a motive to lie about the attack upon him, and he had nothing to gain lying about the attack or the identity of the attacker. In fact, falsely accusing appellant would be contrary to Smith's self-interest, much in the same way a person seeking medical treatment would be acting against his own self-interest by lying to his doctor. Appellant was a caretaker of Smith and his wife. He was of great personal assistance to Smith and Mrs. Smith. Falsely implicating appellant to cause appellant to be charged with the attack would have left Smith without

full-time care upon his release from the nursing home, and would have deprived Mrs. Smith of appellant's services.

Although appellant acknowledges that while Smith may well not have deliberately lied,[4] he contends that Smith's statements were not trustworthy or reliable for another reason. Appellant points out that Smith's mental state was poor. During his interview with investigator Kay, Smith was confused, made inconsistent statements and was forgetful. Appellant points out that Smith believed that John Kennedy was the President of the United States, could not recall what year he got married and could not identify appellant from a six-pack photographic line-up even though he had known him for 15 years. Appellant also points out that Smith was at times confused about the events of the day of the attack, stating that Dinkins arrived before appellant, that his nephew Nato was at the house making coffee and that appellant talked to Smith about money on the telephone while he was at Smith's house. We understand appellant's argument to be that for a hearsay statement to be trustworthy and reliable under section 1380, the proponent of the statement must establish that the declarant was competent to be a witness and had personal knowledge of the events to which he testified.

We agree that the questions of trustworthiness and reliability are intertwined with the issues of whether the declarant is competent to be a witness and has the required personal knowledge. (*Idaho v. Wright, supra*, 497 U.S. at pp. 824-825 [110 S.Ct. at pp. 3151-3152].) In *Wright*, the court emphasized that a hearsay declarant must be capable of " 'receiving just impressions of the facts respecting which [she would be] examined.' " and " 'of relating them truly.' " (*Ibid.*) Lack of these two abilities, both requirements for witnesses under the applicable state law of Idaho, would have rendered the declarant's out-of-court statements unreliable. (*Ibid.*)

California law regarding a witness's competency and personal knowledge contains requirements similar to Idaho law. In order to be qualified as a witness, a person must be capable of expressing himself concerning the matter so as to be understood. (§ 701, subd. (a)(1).) ▮ A witness's competency to testify is determined by the trial court and will be upheld in the absence of a clear abuse of discretion. (*People v. Lewis* (2001) 26 Cal.4th 334, 360 [110 Cal.Rptr.2d 272, 28 P.3d 34].) ▮ Here, the trial court reviewed the videotape and determined that Smith was competent to be a witness. We reach the same conclusion from our review of the videotape transcript. Smith was able to articulate facts so as to be understood.

▮ Further, section 702 requires that a witness at trial have " 'a present recollection of an impression derived from the exercise of the witness's own

---

[4]At trial, defense counsel stated: "I'm not saying Mr. Smith is fabricating anything."

senses.' [Citations.]" (*People v. Lewis* (2001) 26 Cal. 4th 334, 356 [110 Cal.Rptr.2d 272, 28 P.3d 34].) If there is evidence that the witness has the capacity to perceive and recollect, the determination whether he in fact perceived and does recollect is left to the trier of fact. (*People v. Lewis, supra,* 26 Cal.4th at p. 356.) This outcome is mandated by section 403. (§ 403, subd. (a)(2).) Under that section, the trial court must admit the proffered testimony of a witness upon introduction of evidence sufficient to sustain a finding that the witness has personal knowledge of the subject matter of his testimony. (Assem. Com. on Judiciary com., reprinted at 29B pt. 1 West's Ann. Evid. Code (1995 ed) foll. § 403, pp. 361-365.) We review the trial court's determination of the existence of the preliminary fact of personal knowledge under an abuse of discretion standard. (*People v. Lucas* (1995) 12 Cal.4th 415, 466 [Cal.Rptr.2d 525, 907 P.2d 373].)

█ Here, as the trial court recognized, Smith clearly had the capacity to perceive and recollect. He could hear the investigator's questions and when the investigator held up a number of fingers, Smith saw the fingers and gave the correct number. He volunteered repeatedly that he had been struck with a hammer. Smith also clearly had the capacity to recollect. He recalled, for example, that he was married, that his wife was in bed with Alzheimer's and that he had a nurse named Dinkins. He gave a plausible account of the circumstances of the crime, including the fact that he had been hit on the head, and that appellant had attacked him.

Thus, if Smith were a witness at trial, the trial court would have been required to admit his testimony and let the jury decide whether and to what extent to accept it. █ " 'The fact that a witness has made inconsistent and exaggerated statements does not indicate an inability to perceive [or] recollect. . . .' [Citation.] Nor does a witness's mental defect or insane delusions necessarily reflect that the witness lacks the capacity to perceive or recollect. [Citations.] A witness's uncertainty about his or her recollection of events does not preclude admitting his or her testimony. [Citation.]" (*People v. Lewis, supra,* 26 Cal.4th at pp. 356-357 [where witness's testimony "may have consisted of inconsistencies, incoherent responses, and possible hallucinations, delusions and confabulations," but he gave plausible account of circumstances of crime, there was no basis for court to exclude testimony; rather, it was for jury to determine whether witness's recollections were true.].)

█ The trial court reviewed the videotape before admitting it into evidence. Following review of the videotape, the trial court ruled as follows:

"I did carefully view and quite frankly I was concerned about the condition of the witness as he was giving his statements, and particularly when he

appeared to have some problems. But understanding the type of injury that the victim had suffered certainly and at his age and elderly people in general the interview was conducted, as I perceived it, in a very non-informational way. In other words, the investigator never gave the information to Mr. Smith. Mr. Smith always came up with it, tortured at times, true but he came up with the information himself almost the entire way. He would get confused. He would have to have questions repeated. He would wander off, that's correct. But when it came to what was the instrument used on him, he knew. He didn't know exactly how many times. He didn't know exact front and center, but he knew what hit him was the hammer.

"In terms of who did it, he knew exactly. And he stated it over and over again. It was only at the very, very end after two and a half hours of this man just sitting there and he had only got a little bit of water at the end of the interview. You know, that's a lot for an elderly injured gentleman to have to go through.

"And quite frankly, there is no indication of him sitting there conjuring up the defendant's name from clouds. There's no indication that he's making up the scenario. There are indications of some confusion, yes. But the reliability goes to whether or not this person has the state of mind to fabricate. And I don't see in the tape. I think it is reliable.

"I also understand you have an argument in terms of cross-examination.

"The indicia of reliability goes to whether or not somebody is going to purposefully mislead and fabricate. There's no indicia of that in this interview. In terms of cross-examination, that issue was addressed. I'm certain when the Legislature decided to pass the statute . . . specifically in a situation where the person is not available [and] can't be cross-examined they knew that.

"This is the exception to the hearsay rule because of that fact. Because of the age, and the situations. We do have corroborating evidence here. We have DNA corroborating evidence here. So it's not the testimony of the victim is really not the only source of that information. You have that information through other bits and pieces of evidence. And so therefore, I think that under 1380 it is sufficient indicia of reliability and trustworthiness that the video will be allowed to be viewed by the jurors.

"I think under state and federal grounds, it is sufficiently [trustworthy] to be entered into evidence."

The trial court's analysis demonstrates that the court was aware of the applicable law and considered it in reaching its decision to admit the

videotape into evidence. We have reviewed the transcript of the videotape. We agree that there is nothing that indicates that Smith was lying. And we also agree that Smith, though confused and forgetful at time, was able to recollect and communicate facts that he had perceived and, therefore, was competent to be a witness. And we agree, too, that Smith's statements were corroborated by DNA evidence that established that Smith's blood was found on appellant's clothing and boots.

We, therefore, conclude that Smith's hearsay statements were both trustworthy and reliable and properly admitted pursuant to section 1380. The trial court did not err in allowing the videotape and the statements contained on the tape into evidence.

### b. *Confrontation clause claim*

■ Appellant's claim that the admission of Smith's statements violated his rights under the confrontation clause of the United States Constitution is premised on his belief that those statements do not contain sufficient indicia of trustworthiness. As we discuss *ante*, the statements do contain sufficient indicia of trustworthiness. Admission of hearsay that is trustworthy and contains sufficient indicia of reliability violates neither due process or the confrontation clause. (*Idaho v. Wright, supra,* 497 U.S. at pp. 819-820 [110 S.Ct. at pp. 3148-3149]; *In re Lucero L., supra,* 22 Cal.4th at pp. 1243-1244.) Further, cross examination would not have added anything because Smith's confusion was manifest and could be considered by the jury.

2., 3.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### *Disposition*

The judgment is affirmed.

Grignon, Acting P. J., and Mosk, J., concurred.

Appellant's petition for review by the Supreme Court was denied July 23, 2003. Brown, J., did not participate therein.

---

*See footnote, *ante*, page 288.