Filed 5/3/16  P. v. Tovar CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>SALOME ANAYA TOVAR,<br><br>Defendant and Appellant. | F069321<br><br>(Super. Ct. No. F12908404)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Houry A. Sanderson, Judge.

Janet J. Gray, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Daniel B. Bernstein, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury convicted Salome Anaya Tovar (defendant) of first degree burglary (Pen. Code,[1] §§ 459, 460, subd. (a)), but was unable to reach a verdict on the charge he committed a lewd act on a child (§ 288, subd. (a)).[2] Defendant admitted having suffered two prior strike convictions (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)) that were serious felonies (§ 667, subd. (a)(1)). The trial court subsequently struck one of the prior convictions, sentenced defendant to a total term of 17 years in prison, and ordered him to register as a sex offender. On appeal, we hold defendant's statement to police was properly admitted at trial, any error in admitting the victim's statements to police under Evidence Code section 1360 was harmless, and defendant was properly ordered to register as a sex offender. Accordingly, we affirm.

## FACTS

### I

#### PROSECUTION EVIDENCE

On the night of October 17, 2012, 11-year-old A.Z. was sleeping next to her twin sister, S.Z., with whom she shared a bedroom. The bedroom had a door to the backyard. Because the door would not lock, a small nightstand was kept up against it.

That night, A.Z. woke to find defendant sitting on her bed. She had seen defendant before; he slept in a partially enclosed area behind Claudia Ruiz's house next door. The girls' mother, J.Z., sometimes invited defendant over to eat. She let him in to use the bathroom once or twice. He was not allowed in A.Z.'s bedroom, however, and entered the house through the door that opened into the kitchen. J.Z. was the only person allowed to give him permission to enter the house. A.Z. was scared of him. Defendant had previously told A.Z. that she and her sister were very pretty. Once when the sisters

---

[1]     All statutory references are to the Penal Code unless otherwise stated.

[2]     A mistrial was declared, and this charge ultimately was dismissed.

2.

were at a park with some friends for their brother's birthday party, defendant drove by in his truck and S.Z. heard him say A.Z. was pretty.

Although it was dark, A.Z. was able to see defendant. He was looking through her backpack.[3] He turned and looked at her and tried to hide by the bed. She did not say anything, but tried to get up to go to the rest room, which had a door that locked. Defendant grabbed her shoulders and pushed her back onto the bed. She tried to move, but he was holding her too tightly by the arms.

Defendant then lay down next to A.Z. on the left side of the bed. S.Z. was on A.Z.'s right side. He tried to get A.Z. to leave the house with him. He said something about her being pretty. Defendant then put his arms under the covers. He rubbed A.Z.'s vagina over the shorts she was wearing and one of her breasts over her shirt. It scared her and made her feel bad, because she was a little girl. He covered her mouth with his other arm. She told defendant to stop and to get away, but he did not stop. She tried to push him off a few times, but he was stronger than her and did not stop. He said he had a pocket knife and was not afraid to use it. At some point, he whispered that if she would not tell, he would give her $100 each week.

A.Z. grabbed her sister's hand and squeezed "[r]eally hard" to wake her up. At first, S.Z. did not see anything, so she just lay there. Then she heard defendant say, in Spanish, "Let me lick your pussy. It will feel good." S.Z. knew it was defendant, because, although it was dark in the room, there was enough light for her to see the red hat he always wore. S.Z. could see defendant lying on the bed and touching A.Z.'s breasts and vagina over A.Z.'s clothing.[4] S.Z. heard A.Z. tell defendant to leave her alone, but he said he wanted to be her man and she was going to be his lady.

---

**3**      Neither girl ever discovered anything was missing from their room.

**4**      S.Z. believed the touching of the breast came first. She did not think A.Z. was covered in blankets.

S.Z. stood up and told defendant to get out. She did not yell, because she did not want to wake her brothers. Defendant said not to tell her mother and he would get out and get the girls whatever they wanted. S.Z. said okay, and defendant left through the back door.

The girls ran to their mother's room, and told her defendant had come into the house and touched A.Z. S.Z. was very excited and either crying or screaming. She said defendant did not want to leave and had grabbed A.Z.[5]

J.Z. ran outside to find defendant, because she did not know if he was still there. She took the phone with her and was already calling the police as she was running out of the house. She found defendant lying very calmly, but awake, in his hut. She told him what S.Z. had told her and asked how it was possible he could have done that, since he had previously told J.Z. that if she ever had a problem with someone wanting to touch her daughters, she should call him and he would check and see what was happening. He had said he was against people who touched children. He had previously told her, "I'm sorry, bitch, but your girls are really cute."[6]

J.Z. asked him what had happened and why he had gone in to touch her daughters. Defendant said, "Well, bitch, forgive me, but your daughters are really pretty." She asked why he did it, as they were just children. He replied, "No, bitch. Those are fully formed women. They're already fully developed."[7] He also said, "Don't call the police. That's not ever going to happen again."

---

[5] J.Z. recalled that only S.Z. came into the room at first. A.Z. came to the room later.

[6] Defendant was accustomed to calling J.Z. and Ruiz "bitch."

[7] S.Z. recalled him saying the girls were "perfect ladies."

Defendant got into his truck to try to leave, and J.Z. told the police to hurry. When she tried to stop defendant, he pushed her. She tried to keep him from getting into his truck, then the police arrived, pulled him out of the truck, and set him on the curb.

Police were dispatched to J.Z.'s home at approximately 11:11 p.m., in response to a call of a known subject who had been in a residence and reportedly molested the daughters. Sergeant Sherrot of the Reedley Police Department arrived around 11:15 p.m. to find Officer Moles already on the scene, talking to a man and woman outside. Moles frisked the man — defendant — for weapons and contraband, then asked Sherrot to watch defendant while Moles talked to other people who were involved.[8]

Defendant sat on the curb, while Sherrot simply stood by him, as defendant was detained. Sherrot noticed the front zipper of defendant's pants was down. Defendant was wearing a hat.

Sherrot subsequently went into the girls' bedroom. He observed a small dresser inside. It was partially in front of the door that went from the bedroom into the backyard. The dresser was approximately six to eight inches from the door. Sherrot, who was five feet 10 inches tall and weighed about 200 pounds, had to move the dresser before he could go out through the door to look at defendant's living area. Sherrot was wearing his ballistic vest, gun, Taser, and duty belt with his radio, baton, and various tools. If he had not been wearing his gear, he probably could have gotten out of the door without moving the dresser. The dresser was not heavy.

Officer Kincaid of the Reedley Police Department was the primary officer in the investigation. He arrived on scene shortly after 11:00 p.m. He went through the house, and spoke to A.Z. for three or four minutes. She was upset, but, when asked if she saw the person who touched her in the area, said, "That's Salome, right over there on the curb

---

[8]     No weapons, items stolen from the residence, or other items were removed from defendant.

wearing the red hat." Kincaid placed defendant in custody and transported him to the Reedley Police Department.

Kincaid interviewed A.Z. at the police department around midnight. He spoke to her once, interviewed S.Z., and then talked to A.Z. further.[9]

A.Z. was shy and nervous. During the first portion of the interview, she related that she and S.Z. were sleeping on A.Z.'s bed when defendant entered by way of the door that went to the backyard. It did not lock. A.Z. woke to find him sitting on the edge of her bed, looking in her backpack and at her binder. He tried to hide, but when she stood up to go to the rest room, he grabbed her and put her back on the bed and started touching her body. She pulled the covers over herself, but he touched the private parts of her chest over her clothes. He "squish[ed]" one of her breasts with his hand. He also rubbed her vagina over her clothing. He was lying beside her and she was pushing him and telling him to get out, but he did not want to.

A.Z. related that she squeezed S.Z.'s hand to wake her up. At this time, defendant was squeezing A.Z. She could not tell if he had all his clothes on or was touching himself. S.Z. told defendant to "get the hell out" of the house or she would tell their mother. He agreed to go after asking her to promise not to tell. He then left, and the girls went to tell their mother.

When Kincaid interviewed S.Z., S.Z. seemed uncomfortable and upset or mad. S.Z. told Kincaid that when she woke, she heard defendant say, "Let me lick your pussy. It will feel so good." She also related seeing defendant touch A.Z.'s breast and "down low" over A.Z.'s clothing. When S.Z. referred to "down low," she pointed to her vaginal area. S.Z. said that during their brother's birthday party at the park across the street from

---

[9]     Video recordings of both portions of the interview were played for the jury. Both girls testified at trial that they told Kincaid the truth.

their house, defendant drove by and told A.Z. he loved her, she was pretty, and she was going to be his lady forever.

During the second portion of the interview, A.Z. told Kincaid she did not see defendant come into her room or hear the door open. She did not remember if he said anything to her while he was touching her. He had never tried to touch her before. He told her some things, but she did not remember. She never felt that comfortable around him, because every time she was outside with her uncles and family, defendant would walk up and down, looking at what they were doing. A.Z. denied defendant said something to her at her brother's birthday party. A.Z. said she did not go to the park, although her sister, her mother, and some of her cousins did. A.Z. was at the house, helping out. She did not remember if defendant drove by the house and told her anything. The only time he ever told her she was beautiful or he wanted her to be his lady was while he was touching her.

Kincaid also interviewed J.Z., Ruiz, and defendant that night. As far as he knew, each interview was recorded. He subsequently discovered that the final five minutes or so of his interview with defendant, who was the last person he interviewed, was not captured on the recording device for unknown reasons.[10]

During the recorded portion of the interview, defendant denied that anything happened. He explained that he went into the house just to talk to the girls, "to pay attention." He knew J.Z. did not like him. Saturday, she left in the morning. The girls spent all day Thursday inside their room. Defendant did not think it was right. When their mother came back, if he said anything, she told him to shut up. He claimed one of the girls had a boyfriend, and they had opened the door so boyfriends could come into the

---

[10] The portion of the video recording of the interview that existed was played for the jury.

house.  He entered the house to use the rest room.  When he went in, he sat on the floor.  The girls were not sleeping.

Defendant told Kincaid that he was talking to the girls about boyfriends because it was something with which to start a conversation.  Defendant admitted previously telling A.Z. he loved her, but he explained it was love like he felt for his nephews and family.  He never said she was going to be his lady.  He told her he loved her, and maybe one day she would want to marry him when she was bigger.  She was not going to marry him, though, because he was too old.  He only said that when she was nervous or complaining about her mother.  Defendant admitted telling A.Z. a number of times that she was beautiful, but denied asking either girl to go to his living area.

Defendant denied getting on the bed.  He explained his "thing" did not work anymore.  He did not go inside because he was going to do something.  When Kincaid said he would take defendant's clothes to see if there were fibers from the blanket on them, defendant conceded he sat down on the bed.  He denied lying down.  He claimed he and A.Z. only talked.  Defendant subsequently admitted he lay on the bed, but denied doing anything.  He told Kincaid that one day, A.Z. would treat defendant like a man.  However, he did not touch her other than to give her a hug.  They only talked about the two boys defendant saw go inside.  Defendant talked to both girls.

The recorded portion of the interview ended at this point.  During the part that did not record, Kincaid asked whether, if they ran DNA tests on A.Z.'s clothing, they would find anything.  Defendant said he put his hands up, and he made a motion with the palms of his hands touching A.Z.'s breasts.  Defendant said he just put his hands up against her, and he expressed that it was in a nonsexual way.  He denied touching A.Z.'s vagina or touching her in a sexual way.  He made some type of reference to being too old.[11]

---

[11]     Defendant was 59 years old at the time of the interview.  Kincaid estimated his height at five feet eight inches and his weight at about 165 pounds.

8.

Kincaid asked about a statement defendant made to J.Z. at the scene, when she asked why he was in her daughters' room. Defendant told Kincaid he said, "Your daughters are beautiful and I'm a man." Defendant explained he said that to upset her, because she had done something to cause a problem with him and his daughter or wife in the past.

## II

### DEFENSE EVIDENCE

Sometime before this case, there was a gathering in front of Ruiz's house.[12]  A.Z. walked by. Ruiz heard her say to some children that she could not play, because she was in trouble. A.Z. said her mother had beat her up because she did something at school. A.Z. said she had bruises on her legs.[13]

Celia Alderete was the defense investigator assigned to this case. She met with J.Z. on January 15, 2014. Although J.Z. permitted her to photograph the house, she denied Alderete's request for permission to interview A.Z. and S.Z.

Alderete spoke to Ruiz on July 9, 2013, and again on March 6, 2014. Although the July 2013 interview was fairly detailed, Ruiz said nothing about overhearing a statement by A.Z. until the March 2014 interview, which took place the week before Alderete testified.

---

[12]  Defendant was Ruiz's stepfather. Ruiz, who had four children, did not allow defendant to sleep inside her house. He could enter the residence any time he wanted in the daytime, but she kept her doors locked at night, and he had to knock on a door or her window if he needed to use the bathroom or anything.

[13]  During her testimony, A.Z. denied that her mother ever hit her with a stick or caused bruises. S.Z. testified that her mother never hit A.Z. or hurt either girl. J.Z. denied hitting A.Z. on the legs and bruising her, or that defendant expressed concerns about her physically abusing her children.

# DISCUSSION

## I

### ADMISSION OF DEFENDANT'S STATEMENT TO POLICE

Defendant contends the trial court erred by admitting defendant's statement to Kincaid. He says that, in light of his difficulties with the English language, the statement was obtained without a knowing and intelligent waiver of the *Miranda* advisements.[14] We disagree.

### A.    Background

The prosecutor moved, in limine, to admit defendant's video-recorded statement into evidence. In pertinent part, the prosecutor asserted defendant's implied waiver of rights was knowing, intelligent, and voluntary, despite defendant's claimed difficulties with the English language.[15]

An Evidence Code section 402 hearing was held on the motion. The recorded portion of the interview was played for the court. According to the written transcription, the following took place at the outset of the interview, as Kincaid was removing defendant's handcuffs:

"O [Kincaid]: Put your hands back a little bit. There you go.

"S [defendant]: (Inaudible)

---

[14]    *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

In his opening brief, defendant refers to the voluntariness of his statement and the standard of prejudice applicable to the erroneous admission of an involuntary confession. Given his argument as a whole and the facts of this case, we understand him to be addressing voluntariness in the context of his waiver of rights, as opposed to claiming his statement was involuntary because it was the product of coercion or overreaching by the police (see generally *Jackson v. Denno* (1964) 378 U.S. 368, 371, 376-377; *People v. Benson* (1990) 52 Cal.3d 754, 778-779), and we tailor our discussion accordingly.

[15]    The prosecutor also addressed the fact a portion of defendant's statement was not recorded. Defendant does not now claim error based on the partial recording.

10.

"O:  Mm?

"S:  You boss going to come?

"O:  My boss, no he's not coming in.

"S:  No?

"O:  No.

"S:  Why?

"O:  What, why is he going to come in for?

"S:  No (inaudible)

"O:  Oh okay.  But why, he's not coming in.  Why you want to talk to him?

"S:  Yeah maybe (inaudible) okay.

"O:  Alright here's the deal.  Just relax.  You speak English right?

"S:  (Inaudible).

"O:  Kay.  You have the right to remain silent, anything you say can and will be held against you in a court of law.  You have the right to talk to a lawyer and have them present with you while you're being questioned.  If you can not afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish.  You can decide at any time to exercise these rights without answering any questions or make any statements.  Do you understand the rights I have explained to you?

"S:  Yes.

"O:  Kay.  Having these rights in mind, do you wish to talk to me?

"S:  What happened?

"O:  Do you (clears throat)  Do you wish to talk to me?

"S:  About what?  (Inaudible)

"O:  I'm going to talk to you about what happened tonight.

"S:  Yeah.  I talk to you guys already.

11.

"O: Mm hm.

"S: About the, the lady, she don't want me here. Believe me, because she's (inaudible) She went with somebody else (inaudible). And she, I saw that, that one month ago . . .

"O: Mm hm.

"S: In, in that (inaudible) took you know (inaudible).

"O: Okay but we'll talk about that later. Let's talk about what happened tonight.

"S: Nothing happened. Nothing happened. I just talk to the, the girls to pay attention (inaudible) because I know she no like me. . . ."

Kincaid testified defendant never said he did not want to talk about what happened and never asked for a lawyer. During the interview, defendant used Spanish slang a few times. When Kincaid advised defendant of his *Miranda* rights and defendant said "Yes," he understood (according to the transcript), Kincaid believed he said "Yes" in Spanish, to wit, "[S]i." Although some of defendant's answers did not make sense in terms of the question asked, it was "obvious" to Kincaid that defendant knew how to speak and understand English. Kincaid acknowledged a Spanish interpreter was available to assist in the interview; however, Kincaid felt comfortable speaking to defendant, and "when he said he felt comfortable speaking English, that he understood English," it made Kincaid feel comfortable on defendant's behalf as well. At no time during the interview did defendant ask for an interpreter or say he did not understand English. Had defendant asked for an interpreter, Kincaid would have gotten him one. Kincaid conceded he did not recall how defendant responded to the question, "You speak English, right?" It was an affirmative answer, however, and Kincaid felt comfortable with the answer. When Kincaid asked defendant to put his hands behind his back a little, which occurred when Kincaid was removing the handcuffs, defendant complied with Kincaid's request. Before Kincaid asked any questions, defendant started speaking to Kincaid in English and asking about Kincaid's boss.

12.

Defense counsel argued defendant's statement was not given knowingly, intelligently, and voluntarily, as he was not sufficiently fluent in English. Counsel argued it was clear defendant had problems answering a number of Kincaid's questions and gave responses that were unintelligible and unresponsive to the questions. Counsel asserted defendant did not understand his rights, and noted that when Kincaid asked a long question that contained the description of four rights and asked if defendant understood, defendant replied in Spanish.

The court remarked that despite Kincaid's recollection that defendant said "[S]i," the court recalled hearing the answer in English. Defense counsel stated his notes reflected defendant responded "[S]i." After a portion of the recording was replayed, the court stated that the answer to Kincaid's question whether defendant spoke English, which was transcribed as "inaudible," "may have been something other than 'yes,' whether it was 'si' or some other verbal expression. But as far as the answer to 'Do you understand these rights I have explained to you,' the answer is clearly, in [the court's] observation, 'yes' in English." The court further observed that before there was even an advisement, there was "a clear dialogue in English" where defendant engaged Kincaid in that dialogue. The court also found defendant's physical gestures and attentiveness showed he was paying attention to what Kincaid was saying.

Defense counsel argued that fluency in the English language was fundamental to being able to give a knowing and intelligent waiver of rights, and that defendant's answers did not respond intelligently to Kincaid's questions. The court disagreed, finding defendant's replies made sense when the totality of the statement was considered. The court agreed that fluency and comprehension were fundamental to an individual's making a voluntary and informed waiver of his or her constitutional rights, but noted the video showed body language and a number of physical gestures — defendant even getting up, at one point, to demonstrate — which, along with the words, showed the responses were reliable.

13.

Defense counsel noted that, when asked if he wished to talk to Kincaid, defendant responded by asking "[w]hat happened" and then "[a]bout what." Counsel argued there was no waiver of defendant's rights, either explicit or implied. The prosecutor responded that defendant never said he did not understand; moreover, when asked if he understood his rights, defendant audibly answered "yes" and also nodded his head affirmatively. The prosecutor argued there clearly was an implied waiver of rights, and that defendant never then invoked his rights.

The court found defendant would have benefited from the assistance of an interpreter, and noted he was being assisted by one in court. The court found it clear, however, that during the interview, although defendant appeared to have some limitations with some of the usage of his words, he listened to his rights as Kincaid read them and, when asked if he understood, said yes. The court found no rule defendant had to say expressly that he wanted to talk to Kincaid, but found the fact he went straight into conversation to imply he was agreeable to continuing to talk. The court further noted that at no time did defendant say he did not wish to speak or wanted to stop. The court concluded: "I don't find that his waiver of those rights was anything other than voluntary and with full knowledge of what was being explained to him." Accordingly, it declined to exclude defendant's statement to Kincaid on *Miranda* grounds.

As previously stated, the video recording of defendant's statement to Kincaid was played for the jury.

B.    **Analysis**

The Fifth Amendment to the United States Constitution guarantees that a suspect in a criminal case "may not be compelled to be a witness against himself in any respect." (*Colorado v. Spring* (1987) 479 U.S. 564, 574.)[16] To implement this "prohibition against compelled self-incrimination" (*People v. Mickey* (1991) 54 Cal.3d 612, 647), the United

---

[16]    Article I, section 15 of the California Constitution contains the same guarantee.

States Supreme Court in *Miranda* devised the following "prophylactic" rule (*Michigan v. Tucker* (1974) 417 U.S. 433, 446): "[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. . . . Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." (*Miranda*, *supra*, 384 U.S. at p. 444, fn. omitted.)

"*Miranda* holds that '[the] defendant may waive effectuation' of the rights conveyed in the warnings 'provided the waiver is made voluntarily, knowingly and intelligently.' [Citation.] The inquiry has two distinct dimensions. [Citations.] First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived. [Citations.]" (*Moran v. Burbine* (1986) 475 U.S. 412, 421; accord, *People v. Smith* (2007) 40 Cal.4th 483, 501-502.)

The question whether a waiver is knowing and voluntary focuses on an evaluation of the defendant's state of mind. (*People v. Sauceda-Contreras* (2012) 55 Cal.4th 203, 218.) "Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law." (*Moran v. Burbine*, *supra*, 475 U.S. at pp. 422-423, fn. omitted.) "After a knowing and voluntary waiver,

15.

interrogation may proceed ' "until and unless the suspect clearly requests an attorney." ' [Citation.]" (*People v. Dykes* (2009) 46 Cal.4th 731, 751.)

"[A] suspect who desires to waive his *Miranda* rights and submit to interrogation by law enforcement authorities need not do so with any particular words or phrases. A valid waiver need not be of predetermined form, but instead must reflect that the suspect in fact knowingly and voluntarily waived the rights delineated in the *Miranda* decision. [Citation.]" (*People v. Cruz* (2008) 44 Cal.4th 636, 667; see *North Carolina v. Butler* (1979) 441 U.S. 369, 373.) "A valid waiver may be express or implied. [Citation.] Although it may not be inferred 'simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained' [citation], it may be inferred where 'the actions and words of the person interrogated' clearly imply it. [Citation.]" (*People v. Cortes* (1999) 71 Cal.App.4th 62, 69; see *North Carolina v. Butler*, *supra*, 441 U.S. at p. 373.) As the United States Supreme Court has stated: "Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." (*Berghuis v. Thompkins* (2010) 560 U.S. 370, 384; see *People v. Sauceda-Contreras*, *supra*, 55 Cal.4th at pp. 218-219 [suspect's expressed willingness to answer questions after acknowledging understanding of *Miranda* rights sufficient to constitute implied waiver of such rights].)

The prosecution has the burden of demonstrating the validity of a defendant's *Miranda* waiver by a preponderance of the evidence. (*Colorado v. Connelly* (1986) 479 U.S. 157, 168; *Lego v. Twomey* (1972) 404 U.S. 477, 489; *People v. Dykes*, *supra*, 46 Cal.4th at p. 751.) "In reviewing the trial court's denial of a suppression motion on *Miranda* . . . grounds, ' " 'we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. We independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained.' " ' [Citations.]

16.

Where, as was the case here, an interview is recorded, the facts surrounding the admission or confession are undisputed and we may apply independent review. [Citation.]" (*People v. Duff* (2014) 58 Cal.4th 527, 551.) To this end, we have had the video recording of defendant's interview with Kincaid transmitted to us, and have viewed it.[17] "While we must review the record and make an independent determination of the question, we, like the United States Supreme Court, may 'give great weight to the considered conclusions' of a lower court that has previously reviewed the same evidence. [Citation.]" (*People v. Jennings* (1988) 46 Cal.3d 963, 979.) Having viewed the video recording and observed defendant's interaction with Kincaid, we, like the trial court, conclude defendant's implied waiver of his *Miranda* rights was valid. Hence, his statement was properly admitted at trial.

The voluntariness of defendant's waiver is clear. "[T]he record is devoid of any suggestion that [Kincaid] resorted to physical or psychological pressure to elicit statements from defendant. To the contrary, defendant's willingness to speak with [Kincaid] is readily apparent from his responses. He was not worn down by improper interrogation tactics, lengthy questioning, or trickery or deceit. [Citations.] He was not induced to provide his statement[] by improper promises." (*People v. Whitson* (1998) 17 Cal.4th 229, 248-249; see *Moran v. Burbine*, *supra*, 475 U.S. at pp. 421-422.)

The question is whether defendant's waiver was knowing and intelligent. This turns, in large part, on whether the *Miranda* advisements, which undisputedly were given by Kincaid, were understood by defendant. (See *Berghuis v. Thompkins*, *supra*, 560 U.S. at p. 384.) After viewing the video recording (which gives a much different and more

---

**17** Appellate counsel relies on the fact the statement was recorded to assert this court must independently review the trial court's determination. Insofar as the record on appeal shows, however, counsel failed to take the requisite steps to have the recording transmitted to this court. (See Cal. Rules of Court, rules 8.224(a)(1), 8.320(e).) Although we were not required to do so, we directed the superior court to send us the exhibit. (*Id.*, rule 8.224(d).)

17.

complete depiction of defendant's interaction with Kincaid than does the written transcript), we agree with the trial court that although defendant had some language limitations where English was concerned and would have benefited from the assistance of an interpreter, he understood his rights and waived them with "full knowledge of what was being explained to him."[18]

While Kincaid did not individually state or explain each right to defendant, defendant had extensive prior experience with the criminal process.[19] (Compare *People v. Hawthorne* (2009) 46 Cal.4th 67, 88, overruled on another ground in *People v. McKinnon* (2011) 52 Cal.4th 610, 637-643 with *U.S. v. Garibay* (9th Cir. 1998) 143 F.3d 534, 538-539.) Defendant never asked for an interpreter. Significantly, we do not find defendant's answers to the questions whether he wished to talk to Kincaid ("What happened?" and "About what?") to be nonresponsive or to show a lack of comprehension; rather, defendant clearly was eager to give his version of events and attempt to persuade Kincaid nothing improper took place. (See *People v. Hawthorne*, *supra*, 46 Cal.4th at pp. 87-88.) That Kincaid sporadically had to explain a word, such as

---

[18]     Our viewing of the video recording showed, in pertinent part, that while defendant answered "Si" to Kincaid's question whether he spoke English, he also nodded affirmatively. When Kincaid asked if defendant understood his rights, defendant responded "Yes" and again nodded affirmatively. In addition, we question whether, when Kincaid first asked if, having his rights in mind, defendant wished to talk to him, defendant answered "What happened?" as shown in the transcription of the recording. We think defendant said, "Pardon me?" which is consistent with Kincaid raising his voice somewhat when he repeated his question. Because we cannot be certain, however, our analysis assumes the transcription is correct on this point.

[19]     According to the probation officer's report, defendant had two felony and five misdemeanor cases pending, and a criminal record that dated back to 1976 and included a 1990 conviction for attempted murder and a 1996 conviction for felony domestic violence. At the time it ruled on the *Miranda* issue, the trial court was aware, through motions in limine, of at least a portion of defendant's prior record. The trial court was also aware Kincaid had referred, at the preliminary hearing, to dealing with defendant in the past, with the implication being he previously had arrested defendant.

18.

"fiber," or that defendant occasionally used a basic Spanish term, such as "pero" and "desde," does not change this, since the video recording shows no indication either man had trouble understanding what the other was saying. (See *U.S. v. Rodriguez-Preciado* (9th Cir. 2005) 399 F.3d 1118, 1127-1128.)

Language difficulties encountered by a defendant during custodial interrogation are "one factor" to be considered in determining whether a defendant knowingly and intelligently waived his or her *Miranda* rights (*U.S. v. Garibay*, *supra*, 143 F.3d at p. 537), but, at least where, as here, those difficulties are not so extreme as to impede understanding, they are not dispositive (see *U.S. v. Rodriguez-Preciado*, *supra*, 399 F.3d at pp. 1127-1128). The record before us supports a finding defendant was sufficiently proficient in English to have validly waived his rights, and it contains absolutely no suggestion defendant had a low IQ or other mental capacity or comprehension problem that may have adversely affected his ability to understand his rights and/or assess the consequences of waiving them and speaking to Kincaid. (Cf. *U.S. v. Garibay*, *supra*, 143 F.3d at pp. 537-539 & fn. 6.)

Having considered the totality of the circumstances surrounding defendant's interrogation and the recording thereof, we conclude defendant understood and implicitly waived his rights. Accordingly, his statement was properly admitted at trial.

## II

### ADMISSION OF A.Z.'S STATEMENTS TO POLICE

Defendant contends the trial court erred by admitting the statement A.Z. made to Kincaid at the police station on the night of events. Defendant says (1) the statement was unreliable due to leading and suggestive questioning, and (2) A.Z.'s trial testimony was rendered fundamentally unreliable as a result of the memory-altering interview techniques, and so its admission violated due process. We find no basis for reversal.

19.

## A. **Background**

As set out in the statement of facts, *ante*, Kincaid interviewed A.Z. and S.Z. at the Reedley Police Department on the night of the incident. Those interviews were videotaped. The prosecutor moved, in limine, for admission of the recording of A.Z.'s interview pursuant to Evidence Code section 1360. The court decided to hold a hearing on indicia of reliability, as provided in subdivision (a) of the statute.

After the trial court viewed the video recording of A.Z.'s statement, it noted there were some areas that were objectionable. Defense counsel objected to any of the statement being played for the jury, however. He argued there were numerous instances in which Kincaid led A.Z. to the responses he wanted, and so the circumstances in which the statement was obtained did not constitute indicia of reliability.[20] Counsel argued A.Z. "succumb[ed] to what the officer wanted to hear," and the fact the officer was in full uniform and the interview was conducted in a police setting indicated a child would not be free to give her account of what transpired; hence, the statement was not reliable. The prosecutor responded that although the multi-disciplinary interview consortium might be the preferred method of obtaining and presenting the interviews of young witnesses, it was not required by statute. He urged the court to analyze the totality of the circumstances, and argued that while Kincaid may have clarified responses at times, he did not lead A.Z. through the interview.

The trial court stated:

"[I]t's this Court's belief that the preferred method of interviewing younger witnesses would be through the multi-disciplinary consortium . . . . But it appears this officer interviewed this witness fresh to the date of the actual incident, meaning hours after the incident had come to light. Certainly, that is in and of itself a factor of reliability and opportunity to not have

---

[20] Defense counsel also objected that the prosecution did not provide adequate notice of its intent to offer the statement into evidence. As defendant does not repeat this claim on appeal, we do not discuss it further.

20.

individuals come together and present a coached or rehearsed statement. Instead, much more of a fresh perspective from the witness's point of view and or the perceptions of what the witness observed and experienced.

"The witness will be available to testify, so there's no issue about the witness not being able to testify. . . . And, in fact, the testimony will have to proceed in this Court's opinion before any introduction of the video . . . . There is sufficient indicia of reliability for the reasons I've just stated. The timing soon after the incident. Not allowing any opportunities for the mother or the witness's sister that was in the same room at the time of this incident to come together and collaborate their statements. The fact that the officer was questioning the witness. As I watched the witness there were, actually, times when the witness nodded in affirmative and . . . it was not actually caught with the transcript even before the Court. And I stopped taking notes of those because it appeared that too was somewhat regular where the witness would nod, and witness would then be questioned again, and witness would be consistent with the verbal statements. But I don't find that this is unreliable statement because of the setting. I also find that it's contemporaneous to the time and date of the incident. . . . The facts of this case appear to lend it [*sic*] itself to reliability of the statement given by the witness."

As previously stated, the video recording of both portions of A.Z.'s interview was admitted into evidence and played for the jury.

## B.     Analysis

Evidence Code section 1360, subdivision (a) provides in pertinent part: "In a criminal prosecution where the victim is a minor, a statement made by the victim when under the age of 12 describing any act of child abuse . . . performed with or on the child by another, . . . is not made inadmissible by the hearsay rule if all of the following apply: [¶] (1) The statement is not otherwise admissible by statute or court rule. [¶] (2) The court finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provide sufficient indicia of reliability. [¶] (3) The child . . . : [¶] (A) Testifies at the proceedings."[21]

---

[21]     Because A.Z. testified at trial, defendant's confrontation rights were not implicated by application of the statute. (See *Crawford v. Washington* (2004) 541 U.S. 36, 59, fn. 9 (*Crawford*); *People v. Morrison* (2004) 34 Cal.4th 698, 720.)

"We review a trial court's admission of evidence under [Evidence Code] section 1360 for abuse of discretion.  [Citation.]"  (*People v. Roberto V.* (2001) 93 Cal.App.4th 1350, 1367; see *People v. Waidla* (2000) 22 Cal.4th 690, 724.)  A trial court has "broad discretion" in determining whether a party has established the foundational requirements for application of a hearsay exception.  (*People v. Martinez* (2000) 22 Cal.4th 106, 120; see *People v. Pirwani* (2004) 119 Cal.App.4th 770, 787.)[22]

The California Supreme Court has identified the following nonexhaustive list of factors as being relevant to the reliability of hearsay statements made by a child witness in a sexual abuse case:  (1) spontaneity and consistent repetition; (2) the declarant's mental state; (3) use of terminology unexpected of a child of a similar age; (4) lack of motive to fabricate; and (5) the child's ability to understand the duty to tell the truth and to distinguish between truth and falsity.  (*In re Cindy L.* (1997) 17 Cal.4th 15, 29-30; see *Idaho v. Wright* (1990) 497 U.S. 805, 821-822, abrogated in part by *Crawford*, *supra*, 541 U.S. at pp. 60-62.)  Defendant does not claim these factors were insufficiently

---

[22]    It has been held that a trial court's findings concerning indicia of reliability are subject to independent review on appeal.  (*People v. Tatum* (2003) 108 Cal.App.4th 288, 296; *People v. Eccleston* (2001) 89 Cal.App.4th 436, 445-446; but see *People v. Brodit* (1998) 61 Cal.App.4th 1312, 1330 [applying abuse of discretion standard to trial court's finding hearsay statements were reliable for purposes of Evid. Code, § 1360].)  The cases so holding cite *Lilly v. Virginia* (1999) 527 U.S. 116, 136 as authority for that proposition.  In *Lilly*, however, the United States Supreme Court followed the standard set forth in *Ohio v. Roberts* (1980) 448 U.S. 56, which conditioned the admission of hearsay evidence on whether it fell "within a firmly rooted hearsay exception" or bore "adequate 'indicia of reliability.' "  (*Id*. at p. 66; see *Lilly*, *supra*, 527 U.S. at pp. 124-125 (plur. opn. of Stevens, J.).)  *Roberts* in turn was abrogated by *Crawford*, *supra*, 541 U.S. at pages 60-62, thereby rendering *Lilly* "a dead letter" (*U.S. v. Smalls* (10th Cir. 2010) 605 F.3d 765, 773).

In light of these developments in the law, it appears to us the "reliability" requirement of Evidence Code section 1360, subdivision (a) is now a foundational one subject to the usual abuse of discretion standard of review applicable to state law hearsay exceptions in general.  We need not make this determination, since our conclusion in the present case would be the same under either standard.

established; rather, he says Kincaid's leading and suggestive questions "created an unreliable accounting of events."

We have reviewed a transcript of both portions of A.Z.'s interview. (See *People v. Tatum*, *supra*, 108 Cal.App.4th at p. 300.) We agree with the Attorney General that, for the most part, Kincaid posed leading questions in an attempt to clarify A.Z.'s previous statements and responses. A.Z. often included extensive information in her answers, necessitating clarification or follow-up questioning. She clearly felt comfortable answering questions negatively and offering further explanations or correcting Kincaid. "This sort of comprehension and independence can be viewed as enhancing her reliability. [Citation.]" (*People v. Eccleston*, *supra*, 89 Cal.App.4th at p. 447.)

Defendant argues the second part of A.Z.'s interview was particularly suggestive, as it was "a not so subtle attempt to sync A.Z.'s story with S.Z.['s] account of events." However, A.Z. was sufficiently independent to maintain, for example, that she did not see defendant come into the room or hear when the door opened, even when Kincaid informed her that S.Z. said she heard the door open. A.Z. also insisted she did not go to Washington Park.[23]

We recognize the following took place during the second part of the interview:

> "O [Kincaid]: Okay. Now, did he, when he was uh touching you, did he, was he, *did he tell you anything, say anything to you? No? Did he may have and you don't remember or you're sure he didn't?*

> "A [A.Z.]: *Well, I really don't remember.*

> "O: Okay. So you would, would you remember if he said anything to you about, the way you look or about touching you or any of that kind of stuff? *Anything pop into your mind, anything jog your memory on that? No?* Okay. . . . [¶] . . . [¶]

---

**23** Kincaid clearly asked about an incident at the park because of information S.Z. provided.

23.

"O: Kay, . . . . He didn't, did he ever ask you, um, for permission to touch you anywhere or anything like that or to kiss you or anything like that? Mm, did he try to kiss you? No? What was he doing when he was touching you?

"A: He (inaudible).

"O: Not saying anything, not trying to kiss you or hug you? Well he squeezed you right? *And he didn't tell you anything when he was squeezing you? No? Okay. You think there's a possibility that he may have told you some stuff and you were scared and don't remember. Or you were for sure he didn't tell you anything?*

"A: *Well he told me some stuff but I don't remember.*" (Italics added.)

Even if we were to conclude the foregoing portion of A.Z.'s interview lacked, due to suggestive questioning by Kincaid, sufficient indicia of reliability for admission pursuant to Evidence Code section 1360, we would hold reversal is not warranted: No "reasonable probability exists that the jury would have reached a different result had this evidence been excluded. [Citations.]" (*People v. Whitson*, *supra*, 17 Cal.4th at p. 251; see *People v. Watson* (1956) 46 Cal.2d 818, 836.) A.Z., S.Z., and Kincaid all testified at trial and were subject to cross-examination. "[T]he reliability of testimonial hearsay is best established by 'the crucible of cross-examination.' [Citation.]" (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1028, fn. 19, quoting *Crawford*, *supra*, 541 U.S. at p. 61.) Defendant was free to establish, if he could, the unreliability of A.Z.'s statement and testimony. Since the jury did not convict him of committing a lewd or lascivious act on A.Z., we presume he was partially successful.

Defendant says admission of A.Z.'s interview statements violated his right to due process. He offered no constitutional basis for his objection in the trial court. "Under these circumstances, a constitutional claim is not cognizable on appeal unless (1) it 'is of a kind (e.g., failure to instruct sua sponte; erroneous instruction affecting defendant's substantial rights) that required no trial court action by the defendant to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial

24.

court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional *legal consequence* of violating the Constitution.' [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 353.) Defendant's due process claim does not fall into the first category. Thus, it is "preserved only to the extent that the federal aspect is a gloss on the claim of error actually raised. [Citation.]" (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 413, fn. 34; see Evid. Code, § 353, subd. (a).)

"The admission of evidence results in a due process violation only if it makes the trial fundamentally unfair. [Citation.] 'Only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must "be of such quality as necessarily prevents a fair trial." [Citations.]' " (*People v. Hunt* (2011) 196 Cal.App.4th 811, 817; see *People v. Falsetta* (1999) 21 Cal.4th 903, 913.)

To the extent any of A.Z.'s interview was erroneously admitted, it did not render defendant's trial fundamentally unfair. Accordingly, defendant has failed to establish a due process violation.

Defendant declares, however, that "the admission of a child's statement tainted by memory altering interviewing techniques violates due process of law." (Original capitalization & underscoring omitted.) Likening the situation to one involving suggestive lineup procedures, he argues for use of the type of pretrial "taint" hearing described in *State v. Michaels* (1994) 136 N.J. 299 [642 A.2d 1372, 1382-1383], in which "[t]he basic issue to be addressed . . . is whether the pretrial events, the investigatory interviews and interrogations, were so suggestive that they give rise to a substantial likelihood of irreparably mistaken or false recollection of material facts bearing on defendant's guilt. [Citations.]" (*Ibid.*) Defendant goes on to assert that "[w]here the defense shows that a child has been subjected to suggestive interview procedures, the testimony of that child *must be excluded* unless the prosecution can establish those

25.

procedures did not affect the child's memory, just as testimony tainted by suggestive identification procedures would be excluded. [Citation.]" (Italics added.)

Defendant made no such claim in the trial court, and never moved for exclusion of A.Z.'s actual testimony. To do so now would invoke facts and/or legal standards different than those the trial court was asked to apply. (See *People v. Zamudio*, *supra*, 43 Cal.4th at p. 353.) "A party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct." (*People v. Partida* (2005) 37 Cal.4th 428, 435.)

Defendant asserts, in his reply brief, that he is not raising an additional legal theory, but rather is pointing to the fact that the interview statement was read to A.Z. prior to her testifying. Defendant misrepresents the record.[24]

We recognize child testimony can be "unreliable, induced, and even imagined . . . ." (*Kennedy v. Louisiana* (2008) 554 U.S. 407, 443.) Defendant was free to attempt to show such was the case where A.Z. was concerned. The fact remains, however, that he never sought exclusion of A.Z.'s trial testimony. Under the circumstances of this case, " 'a claim that the trial court erred on the issue actually before that court' " simply does not " 'lead[] to rejection of the newly applied constitutional "gloss" as well.' " (*People v. Chism* (2014) 58 Cal.4th 1266, 1290, fn. 9.) Accordingly, to the extent defendant contends more than simply that erroneous admission of A.Z.'s interview statements under Evidence Code section 1360 violated due process, the claim

---

**24** Stacy Cordero, an investigator for the district attorney's office, testified without contradiction that she and the prosecutor met with A.Z. a couple of weeks before trial in an effort to prepare A.Z. for what to expect in the courtroom. Because it was "extremely difficult" to talk to A.Z., Cordero "mov[ed] the process along" by reading A.Z. a "very limited portion of the *report* which Officer Kincaid had authored." (Italics added.) Cordero expressly testified that she did not show A.Z. the video-recorded interview A.Z. gave to Kincaid or the transcript of that interview, or even read from the transcript. On cross-examination, she testified she only read two paragraphs of the report to A.Z., and did so to "keep things moving forward." She explained A.Z. was not refusing to talk or saying she did not remember; rather, she was being shy and guarded in answering questions concerning where defendant touched her.

has not been preserved for appeal. (See *People v. Partida*, *supra*, 37 Cal.4th at pp. 438-439; *People v. Marks* (2003) 31 Cal.4th 197, 228.)

**III**

**<u>REQUIREMENT THAT DEFENDANT REGISTER AS A SEX OFFENDER</u>**

Defendant says the trial court erred when it ordered him to register as a sex offender, because it failed to (1) comply with the authorizing statute and (2) state adequate reasons. We find no reason to strike the order.

**A.      Background**

At sentencing, the trial court asked both counsel if they wanted time to prepare to address the issue of sex offender registration, which the probation officer's report had not mentioned. The court noted section 290.006 gave it discretion to require sex offender registration if it found the offense was committed as a result of sexual compulsion or for purpose of sexual gratification, and that reasons had to be stated for findings in that regard and for requiring registration. The court clarified it was not saying it was going to make the necessary finding, but was "putting [the issue] on the table," because it needed to be addressed. The prosecutor stated he was ready to argue the matter, but defense counsel accepted the court's offer of time to prepare. Accordingly, the court took a brief recess. Following the recess, defense counsel confirmed he was ready to proceed.

Defense counsel asked the court not to order registration, as there was no physical evidence defendant molested A.Z.; there were "major inconsistencies" between A.Z.'s and S.Z.'s accounts; A.Z. said defendant was looking through her backpack when she woke, indicating defendant had no sexual intent upon entry; and defendant had no history of sexual offenses. The prosecutor responded by pointing to the jury's finding defendant entered the residence with the intent to commit a lewd act on a child.

After partially imposing sentence, the trial court stated:

> "As to Penal Code 290, I have reviewed my own notes, certainly reviewed the report for the probation as it was submitted. The harm that

27.

this has caused to [A.Z.] and [S.Z.] to have been exposed to this type of a traumatic incident in their own home in their own bed at the late hours of the night, to their mother, as the mother professes in her own letter. I have reviewed the notes from the trial where the two sisters both testified more or less to the same root facts. Some certain inconsistences were present, but when not material and/or otherwise resolved by other evidence certainly did not rise to the level that the court found to be so inconsistent that they were diametrically opposed. The root facts remain the same, that at the late hours of the night a man that they knew, that lived in the back of . . . mutual properties with theirs and another residence nearby, entered their home through an area of their home that was not allowed for people to come through without their mother's approval. In fact it what's [*sic*] a door that was blocked with a bedroom furniture. It was opened against their knowledge, against their invitation, and Mr. Tovar was seen in the room on the floor initially looking through the backpack. . . . That both girls were in bed either asleep, acting asleep or falling asleep, so it was not at a time of the night or the day when they were sitting up watching TV and he entered to chat with them about their lives or their boyfriends or their family lives, without the parent's permission, without announcing his presence, taking advantage of what would be a trust-type relationship where they would know a person, recognize him. Particularly disturbing when a person is allowed to remain on the property and takes advantage of this nature. Used what was identified by at least one of the sisters sexual natured language about doing certain things to [A.Z.], that it would make her feel good. That gives no doubt in the court's mind that this activity was for sexual gratification. This is predatory behavior by Mr. Tovar. There's no question that this behavior was for sexual gratification. Penal Code 290.006 states that the court must state on the record if the court finds that it is, in fact, sexual gratification reasons. The evidence speaks for itself that that . . . was Mr. Tovar's mission that evening. Whether he started off by looking through the backpack or not, that appears to have been and was the finding by the jurors to be his specific intent that night when he entered the room. Why they were unable to reach a unanimous decision on Count 1 is not for me to speculate, counsel. . . . [B]ut clearly the verdict form as read, as polled, stated [section] 288 being the specific intent of the entrance. Therefore, this court does believe that to protect to [*sic*] the vulnerable members of this society that Mr. Tovar be ordered to register pursuant to Penal Code 290, and I will therefore exercise my discretion in this case in favor of ordering him to register pursuant to [section] 290 for the rest of his life. I understand it's not mandatory. I understand it's discretionary. But in the court's discretion and the facts of this case does [*sic*] dictate that the court should order [section] 290 registration."

**B.** **Analysis**

Section 290, subdivision (b) mandates lifetime registration for anyone convicted of an offense listed in subdivision (c) of the statute. Burglary with intent to commit a lewd and lascivious act on a child under age 14 is not listed in subdivision (c) of section 290; hence, a person convicted of that offense is exempt from section 290's mandatory lifetime registration. (*People v. Hofsheier* (2006) 37 Cal.4th 1185, 1197 (*Hofsheier*), overruled on another ground in *Johnson v. Department of Justice* (2015) 60 Cal.4th 871, 888 (*Johnson*).)

This does not mean such a person escapes registration, however. Section 290.006 provides: "Any person ordered by any court to register pursuant to [section 290 et seq.] for any offense not included specifically in subdivision (c) of Section 290, shall so register, if the court finds at the time of conviction or sentencing that the person committed the offense as a result of sexual compulsion or for purposes of sexual gratification. The court shall state on the record the reasons for its findings and the reasons for requiring registration."

This statute (the terms of which previously were contained in subd. (a)(2)(E) of § 290) "leaves the trial judge with the option of refusing to order registration." (*Hofsheier*, *supra*, 37 Cal.4th at p. 1197.) "[T]o implement the requirements of section [290.006], the trial court must engage in a two-step process: (1) it must find whether the offense was committed as a result of sexual compulsion or for purposes of sexual gratification, and state the reasons for these findings; and (2) it must state the reasons for requiring lifetime registration as a sex offender. By requiring a separate statement of reasons for requiring registration even if the trial court finds the offense was committed as a result of sexual compulsion or for purposes of sexual gratification, the statute gives the trial court discretion to weigh the reasons for and against registration in each particular case." (*Ibid.*)

"In order to make a discretionary determination as to whether or not to require registration [under section 290.006], the trial court logically should be able to consider all relevant information available to it at the time it makes its decision." (*People v. Garcia* (2008) 161 Cal.App.4th 475, 483, disapproved on another ground in *Johnson*, *supra*, 60 Cal.4th at p. 888 & disapproved on another ground in *People v. Picklesimer* (2010) 48 Cal.4th 330, 338-339, fn. 4.) "One of the purposes of the sex offender registration requirements ' " ' "is to assure that persons convicted of the crimes enumerated therein shall be readily available for police surveillance at all times because the Legislature deemed them likely to commit similar offenses in the future. [Citation.]" ' " [Citations.]' [Citation.] Where registration is discretionary, then, one consideration before the court must be the likelihood that the defendant will reoffend." (*People v. Garcia*, *supra*, 161 Cal.App.4th at pp. 484-485; accord, *People v. Thompson* (2009) 177 Cal.App.4th 1424, 1431, disapproved on another ground in *Johnson*, *supra*, 60 Cal.4th at p. 888.)

We conclude the trial court here undertook the requisite two-step process and stated its reasons for its findings. The court's statement defendant should be ordered to register "to protect . . . the vulnerable members of . . . society" shows the court implicitly considered the likelihood, and found it likely, defendant would reoffend. Given the purposes of sex offender registration, this constituted a reason for requiring lifetime registration. In light of the facts of the case, we cannot say the trial court acted irrationally. (See *People v. Carmony* (2004) 33 Cal.4th 367, 377.) If defendant felt a necessary finding or statement of reasons was omitted or that the reasons given were inadequate, he should have objected or requested more from the court. Because he failed to do so, he cannot be heard to complain on appeal. (*People v. Bautista* (1998) 63 Cal.App.4th 865, 868; see *People v. Scott* (1994) 9 Cal.4th 331, 353 [failure to object forfeits claims involving trial court's failure to properly make or articulate discretionary sentencing choices]; see also *People v. Scott* (2015) 61 Cal.4th 363, 406 [failure to object forfeits claims trial court failed to state reasons or adequate reasons applicable to two-

step process under § 667.6, subd. (c), as required by *People v. Belmontes* (1983) 34 Cal.3d 335, 347-348].)

Defendant says any further objection or request for articulation would have been futile; hence, any failure to object should be excused. (See *People v. Hill* (1998) 17 Cal.4th 800, 820.) The record does not support his assertion.[25] Nor has defendant established the trial court's reasoning was flawed. (See *People v. Carmony*, *supra*, 33 Cal.4th at p. 376.)

In sum, the trial court considered the applicable legal policies and principles, and it is immaterial that reasonable people might disagree with its registration order. (See *People v. Carmony*, *supra*, 33 Cal.4th at pp. 376-377.) There was no abuse of discretion.

## DISPOSITION

The judgment is affirmed.

_____

DETJEN, J.

WE CONCUR:


_____

LEVY, Acting P.J.


_____

FRANSON, J.

---

[25] Indeed, after the trial court finished advising defendant of his appeal rights, both counsel were permitted to raise issues with respect to the sentence already imposed. The trial court slightly altered portions of the sentence in response to each party's request.