Filed 8/18/22  P. v. Jackson CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JONATHAN JACKSON,<br><br>    Defendant and Appellant. | A159545<br><br>Contra Costa County<br>Super. Ct. No. 51705987) |

An 81-year-old woman died six months after she was severely beaten and brutally sexually assaulted. Through DNA evidence, defendant Jonathan Jackson was implicated in the crimes. A jury convicted Jackson of first degree felony murder, rape, kidnapping to commit rape, and forcible penetration by a foreign object. The trial court sentenced him to life without the possibility of parole. On appeal, Jackson raises numerous claims of error, including the exclusion of an exculpatory statement made by the victim before she died, insufficient evidence regarding the cause of death, insufficient evidence of separate acts of sexual penetration, prosecutorial misconduct, and imposition of a parole revocation fine. Jackson contends the cumulative effect of these errors denied him a fair trial and due process. Additionally, he challenges the constitutionality of the felony-murder special-circumstances law. With the exception of the parole revocation fine, which the People agree must be stricken, we affirm the judgment.

1

## I. FACTS

### A. Prosecution Case

#### 1. *Brutal Sexual Assault of Jane Doe*

In 2012, 81-year-old Jane Doe[1] lived at an independent senior living center on San Pablo Avenue in El Cerrito. Those who knew her described her as "vibrant" and independent; she was able to cook and clean for herself. She regularly participated in activities at the residence. Doe also liked to walk in the mornings, typically from her residence to Central Avenue. El Cerrito police officers who patrolled Doe's neighborhood would see her walking "up and down" the west side of San Pablo Avenue, between 3:00 a.m. and 6:00 a.m., during the work week. Her walks were a "couple miles" round trip and often took her past the Big O Tires store on San Pablo Avenue.

On January 28, 2012, at approximately 9:20 a.m., El Cerrito police received a dispatch call that a "female needed help" at the Big O Tires store. The responding officer found Doe, curled up in a fetal position, slumped over some used tires, on the side of the business, covered in blood. He immediately told dispatch to send medical help as Doe had extensive injuries. She had blood on her face and jacket and in her hair, and there was blood on the ground and on the nearby walls. Her pants were pulled down below her buttocks, and her underwear was found inside one of the tires. She was wearing her left shoe and sock but missing her right ones. Doe had scrapes on her side, hip, and legs, and it appeared she had been dragged across the cement.

---

[1] Pursuant to the California Rules of Court, rule 8.90(b)(4), (10), (11), governing "Privacy in Opinions," we refer to the victim as Jane Doe and certain witnesses by their initials.

Police located Doe's missing shoe which was located on the roof of the tire store. A human tooth and fecal matter were found at the scene. Human hair was adhered to some of the tires. The area in which Doe and her clothing were found was between 74 and 82 feet from the sidewalk on San Pablo Avenue. The shoe Doe was wearing had visible drag marks on its outer side. The shoe found on the roof had black scuff marks on its top. Her underwear had "black scuffing" on it as well. No condoms or condom wrappers were found at the scene.

2. *Doe's Extensive Injuries*

Doe was airlifted to John Muir Hospital in Walnut Creek. She was semi-conscious when she arrived at the hospital and was unable to speak. Doe was examined by a sexual assault nurse, who collected evidence, and took photographs.[2] She was intubated and a hard collar stabilized her neck. Her face was extremely swollen and discolored, her eyes were swollen shut, and there were extensive injuries to her face, particularly bruising, swelling, abrasions and lacerations to the right side of her face. Her hands were abraded and bruised, with additional injuries to the ring finger on her right hand. Her hips, buttocks, lower back, legs, knees, ankles, and feet were bruised and lacerated, including areas where the skin was completely abraded away. Her external genitalia were torn lacerated, abraded and bruised. Her vaginal wall was torn in multiple places, including a five-centimeter laceration, such that fat cells from under her skin were visible and her bowels were intruding into her vagina. The blunt force injuries to her vagina and cervix were consistent with a forcible sexual assault.

---

[2] As Doe was unable to consent to the examination, a court order was obtained.

In her 36-year career, the nurse who had examined Doe had performed over 1,000 sexual assault exams. Doe's injuries were the worst she had ever observed either while performing exams or in training. The nurse testified that the blunt force trauma could have been caused by a penis or by a "hard blunt object." Due to the extensive injuries and active bleeding, a sponge was used to collect the fluid evidence in Doe's vagina.

The doctor who treated Doe noted her injuries included a brain bleed, multiple abrasions and contusions, rib fractures and a laceration to her head. The skin was cut in multiple directions and some of the tears of her vaginal wall were so extensive that vaginal reconstructive surgery was required. The vaginal wall had ruptured through to the abdomen so that her internal organs were protruding into the vagina and potentially transferring bacteria from the vagina back into the abdomen, putting her at risk for sepsis. The doctor did not know whether an "instrument or a body part" caused the rupture.

When Doe's family was first allowed to see her, Doe was unrecognizable to them. Her face was swollen and she had tubes connected to her face and an IV connected to her body. Doe was unconscious for a few weeks. Even after regaining consciousness, she could only partially open her eyes for brief periods. She initially could not speak. When she did begin to speak again, she said things that did not make sense. She was never again able to care for herself, dress herself, walk, cook or even go to the bathroom by herself.

3.    *Doe's Death*

On February 17, 2012, Doe was discharged from the hospital and sent to a rehabilitation facility. Then, on March 10, 2012, she was admitted to an acute rehabilitation facility at John Muir Hospital. On March 23, 2012, she

suffered a fall at the facility. A brain scan revealed a subdural hematoma that previously had not been detected.

On April 15, 2012, Doe was transferred to the emergency department at John Muir Hospital as a result of a change in mental status and hematemesis, which is vomiting blood. The physician who performed the endoscopy concluded the upper gastrointestinal bleeding and resulting vomiting was caused by a cancerous tumor.

While at John Muir Hospital, another head scan was performed, which was consistent with the March scan. However, the decision was made to perform surgery to remove blood clots that had formed in her skull as a result of the subdural hematomas.

On May 2, 2012, Doe was released to a care facility. Then, on June 5, 2012, Doe was admitted to a hospice center, where she later died on July 31, 2012.

An autopsy conducted on August 1, 2012 revealed that Doe's subdural hematomas had been drained using burr holes in the skull to reduce pressure from building up on the surface of her brain. Dr. Arnold Josselson, the forensic pathologist who conducted the autopsy, explained that subdural hematoma can cause an inability to swallow, and loss of ability to walk unassisted, care for one's self, and feed one's self. Doe had a slow-growing superficial tumor, about an inch and a half in diameter where her esophagus connected to her stomach. Dr. Josselson opined the tumor, which was only on the surface of the esophagus, had not spread and would have been treatable but for the head injury. Doe had fluid in her lungs and one of the lungs was partially firm, indicating pneumonia. A feeding tube had been inserted because she had been unable to feed herself.  In 2012, the pathologist opined that Doe died of pneumonia, brought on by her head trauma and the tumor.

5

She had been in good cardiovascular condition, indicating regular exercise, there was no evidence of recent stroke activity, and her internal organs were normal. Dr. Josselson also noted that her knees were scarred. Dr. Josselson refined his conclusions about cause of death in 2017, upon review of medical reports that either were not yet available or which he had not seen in 2012. The burr holes were created due to subdural hematomas that developed from the subdural hygroma that was diagnosed upon Doe's initial admission to the hospital. In 2012, Doe had sustained a severe traumatic brain injury categorized as a three on the Glasgow Coma Scale, which is generally associated with a poor outcome, such as disability or death. CAT scans had shown bleeding on the surface of the brain, bleeding inside the cavities of the brain, and fluid between the covering of the brain and the brain itself,[3] which became a subdural hematoma. Due to the traumatic brain injury, Doe was never able to resume daily living activities outside of a hospital setting. The traumatic brain injury would have caused amnesia and disorientation as well as decreased balance and coordination. Brain tissue loss is also accelerated by traumatic brain injury. Moreover, the traumatic brain injury was the reason that her tumor could not be treated. Thus while the immediate cause of death was pneumonia, it became clear that pneumonia was the result of the traumatic brain injury (she was unable to swallow, leading to aspiration pneumonia, confined to a nursing home, which also made her prone to pneumonia) and the tumor, which was untreatable because of the traumatic brain injury. She had no problems swallowing before the traumatic brain

---

[3] Dr. Josselson explained that many radiologists refer to hygromas, the collections of spinal fluid in the brain, as chronic, because the hygromas are already pooled in the brain at the time of their observations, but hygromas can form as a result of injury and the current literature indicates the use of the term "chronic" is misleading and should be avoided in this context.

injury. The manner of death, which is determined by the coroner, not the pathologist, was listed as "undetermined."

### 4. DNA Evidence and Jackson's Subsequent Arrest

The DNA from the sperm in the vaginal sponge from Doe's sexual assault evidence kit was isolated to create a profile of the major contributor to the male DNA. The minor contributor was the victim. The male profile was uploaded into the Combined DNA Index System known as CODIS on June 7, 2012. Based on the testing and examination, there did not appear to be a third contributor to the vaginal sponge sample, just appellant as a major contributor and the victim as a minor contributor. A microscopic examination did not reveal any particles that normally would be associated with the use of a condom.

On September 1, 2016, Pittsburg police arrested Jackson for driving a stolen vehicle and transported him to the Martinez detention facility. On September 22, 2016, police were alerted that Jackson was a potential match to the DNA sample collected from Doe. A reference DNA sample was taken from Jackson pursuant to a warrant. A profile was developed from the buccal swab reference sample from Jackson and compared to the profile created in 2012. The profiles matched. The probability of another perfect match would be one in 140 quintillion for Caucasians, one in 40 quintillion for Hispanics, and one in 63 quintillion for African-Americans. Mathematically speaking, an additional match would not be expected to exist on Earth or even a billion Earths.

## B. Defense Case

### 1. Jackson

Jackson described himself as a sexual experimentalist, interested in bondage, role playing, posting sex acts on the internet and attending public

sex clubs, but he denied engaging in nonconsensual sex. "Prior to January 28, 2012," however, he had never had a sexual interest in older people or dead bodies. He was recovering alcoholic who "still dabbled a little" in 2012. He regularly used alcohol, marijuana, acid and cocaine, and had prior experiences with methamphetamine and LSD.

On the night of January 27, 2012, Jackson was hanging out at his cousin Anthony Trotter's apartment along with others, including another cousin, Romero Wiley. They were all drinking alcohol. Jackson got very drunk. At some point during the night, Jackson went to a nearby liquor store on San Pablo Avenue to buy more alcohol and returned. After getting into a fight with one of his cousins, Jackson decided to leave but could not find his phone. He thought he might have lost it when he went to the liquor store and went looking for it. As he left, he took "a tab of acid," which made "everything kinda surreal." Jackson stopped at the Big O Tire Center to urinate in a dark corner. After relieving himself, he noticed a woman laying over some tires. He assumed she was dead because she was not moving. With his pants not quite pulled up from relieving himself, Jackson "shuffled" over to where the woman was. He began to use his right hand to touch her vagina while holding his penis in his left hand. Although necrophilia was not one of his sexual experimentations in the past, he found himself aroused. While still holding his penis in his left hand, he started touching her vagina with his right hand. He became sexually aroused. At some point he ejaculated, with the semen getting onto his hand, and also switched the hand that he used to touch her.

Jackson denied raping or beating Doe, but took "responsibility for using [his] finger to sexually penetrate [Doe] without her consent and against her will." He also possibly touched Doe's vagina with this left hand. Having not

8

found his phone, Jackson went back to his cousin's apartment and used his cousin's phone to call his mother to pick him up.

2.      *Necrophilia Expert*

Dr. Charles Moser testified that necrophilia is a recognized sexual attraction. It is usually opportunistic. People aroused by the dead do not typically kill to create the condition that feeds the desire. Their arousal is more often triggered when presented with a corpse, and necrophiliacs might even take jobs that give them access to the deceased. Sexual arousal by the deceased can occur in people who have never been diagnosed with necrophilia. Moreover, experiencing one sexually uncommon desire (such as bondage and exhibitionism) can lead to others, even if the triggered arousal does not rise to the level of a paraphilia. Experiencing one form of sexually deviant behavior makes people more open to be aroused by other kinds. And the use of alcohol and drugs, which lower inhibitions, make such arousal even more likely.

3.      *Diagnostic Radiologist*

Dr. Joan Reynolds, a diagnostic radiologist, read the CT scans of Doe's head taken after she was admitted to John Muir Hospital on the day of her attack. She did not detect severe swelling of the brain or a midline shift, which would result from pressure on the brain moving it out of its usual position and affecting oxygen supply. She did detect some signs of brain atrophy, which would be expected in a woman the victim's age. She detected "chronic subdural hygromas," noting that all hygromas are "chronic," meaning that the fluid has "been there for a while." She attributed the hygromas to atrophy, opining that the space created by the atrophy had filled with spinal fluid over time, rather than as a result of the head trauma. She did not compare the CT scan she was reading to any other scans of the

victim's head, taken before or later, and was unable to determine when the hygromas formed, or what further brain damage developed after the injury. She acknowledged that in the elderly, in particular, head injuries can worsen over time after trauma. Whether atrophy of the brain can be caused by traumatic brain injury was a "clinical question" she was not qualified to answer. The full body scan of Doe also showed two broken ribs.

### 4. Neuropsychologist

Dr. Randall Yee, a neuropsychologist, evaluated Doe on three occasions: February 1, March 13, and April 25, 2012. He had no prior medical records, only those generated at John Muir Hospital, which showed a subarachnoid hemorrhage and an intracranial hemorrhage. On February 1, Doe had trouble processing, paying attention, and concentrating. It was difficult for her daughter to understand what Doe was saying. Doe responded to questions, but not always appropriately. She had only a vague recall of the assault, knew she was in the hospital, but not the month or day. Her daughter reported her mother's memory problems were much worse after the assault than the age-related forgetfulness her mother had experienced before the assault. By the second evaluation, on March 13, Doe was in a rehabilitation area and, although she still had significant cognitive deficits, she was able to speak more easily and at least complete the evaluation. She was still well below her baseline of before the head trauma, but was showing some progress. She was processing very slowly and could not do simple arithmetic. Dr. Yee was aware she had taken a fall while in the rehabilitation area. He believed she had recently had surgery to reduce pressure on the brain. She had declined from when he saw her in March.

On cross-examination, Dr. Yee agreed that physical and mental decline, a reduced ability to fight off and recover from health challenges, impaired

10

cognition, physical dysfunction, loss of balance, and a tendency to acquire pneumonia can all accompany a traumatic brain injury. His impressions section in that final report included the observation that she had suffered the original traumatic brain injury, then had a fall on the rehabilitation unit which resulted in subacute frontal subdural hematomas on top of the earlier existing hematomas. Following cross-examination, defense counsel tried to impeach his own witness. Dr. Yee was rehabilitated by the prosecution.

5.      *Forensic Pathologist*

A forensic pathologist, Dr. Judy Melinek, reviewed the autopsy reports and noted the finding of the coroner that the cause of death was undetermined. She believed the cancer caused Doe's death and that an accurate death certificate would describe the cause as "natural." She disagreed with Dr. Josselson, the pathologist who conducted the autopsy, that the pneumonia could be directly traced back to the head trauma. In her opinion Doe died of pneumonia "due to cancer of the gastroesophageal junction." She did agree that subdural hygromas, under certain conditions, can turn into subdural hematomas, which produce pressure on the brain and need to be drained. She also agreed that the subarachnoid hemorrhage increased during the 12 hours between the first and second CT scans, but characterized that as a minor change. Dr. Melinek interpreted the fluid in the brain to have filled in spaces caused by a pre-existing "mild" atrophy, and believed the patient had healed from the traumatic injury within a month, but that the tumor remained and it was the tumor that contributed to the onset of pneumonia. Despite the additive effects of the slow bleeds into the brain, she believed the subsequent falls caused the brain injuries (subdural hematomas) noted on the autopsy report, and that draining the hematomas solved that problem before she died.

11

On cross-examination, Dr. Melinek explained that she assumed the esophageal cancer was already causing swallowing problems before the assault, but perhaps Doe had not reported the trouble, despite the finding of "no dysphagia" a month before the assault in medical reports Dr. Melinek reviewed for her testimony. Dr. Melinek knew Doe walked regularly but did not recall the distance was over two miles per day. Dr. Melinek attributed Doe's inability to ever walk again, dress, fix her own food and go to the bathroom herself, not to the traumatic injuries she received in the sexual assault, but to a weakened state caused by old age, mini strokes that had not noticeably affected her independence, and the underlying conditions, like high blood pressure, COPD, and type 2 diabetes, that she was effectively treating with medication. Recognizing, in part, but discounting that it was the fragile condition Doe was in because of the sexual assault and head trauma that prevented surgery or radiation for the esophageal cancer, Dr. Melinek concluded that since the cancer probably existed before the assault, Doe would ultimately have died of cancer anyway, so she died of natural causes.

Dr. Melinek agreed that her conclusions were based, in part, on Dr. Yee's second report that noted: "her family thinks the patient is close to or at her cognitive baseline. As mentioned, the patient may have been somewhat impaired given reports by her daughter of some memory difficulties at baseline." However, Dr. Yee's final report, which was consistent with his testimony, indicated: "Per the patient's daughter, the patient currently seems to be less than 50 percent of her cognitive baseline."

# II. DISCUSSION

## A.    Exclusion of Doe's Statement

Jackson contends the trial court erred by excluding Doe's description of her assailant as an Asian and not a Black male, possibly 19 or 20 years old. Jackson, who is Black and 37 years old at the time of trial, claims the court prejudicially erred by excluding these exculpatory statements as untrustworthy.

### 1.    *Pretrial Proceeding*

Prior to trial, Jackson moved to include three statements by Doe describing her assailant—one made on February 16, 2012 and two made on April 1, 2012.

At the in limine hearing, Doe's daughter described her mother before the assault as living an independent life, walking every day for exercise, cooking her own meals, negotiating public transit to get around, visiting friends, attending church, getting herself to appointments, and generally being as sharp as a tack, mentally. She never used a cane or had any memory problems. After the assault, Doe was unconscious for almost two weeks, then when she first regained consciousness, she could not move her body or lift her head. She was in constant pain, was not able to speak or remember anything about the attack, stared blankly at her daughter without appearing to recognize her, and barely made eye contact with her family. She regained her ability to speak, but remained very confused, and would make spontaneous statements about things that were untrue. For example, when she saw a male nurse walk by, she said knew him and that his father was a good friend from church. The nurse, however, was a total stranger and his family did not attend Doe's church. Her general weakness, inability to swallow (requiring feeding tubes), confusion, confabulation, and limited speaking ability

continued until her death. The first time her mother spoke of the attack, she said the man who assaulted her had dark hair. She did not say he was Asian. She did not deny he was Black.

On February 16, 2012, not quite three weeks after the assault, Lieutenant Gard, then a detective, interviewed Doe when she was at John Muir Hospital. He interviewed her for 18 minutes with the aid of a Korean language interpreter. "There were lapses in some of her responses where her responses became unintelligible." "The interview was slow . . . [and] she wasn't all there mentally." "She was obviously in a lot of pain. She had just come out of a coma. Just to get basic responses took effort from myself, the interpreter, and her daughter." Doe was confused, disoriented, and had many IV devices and feeding tubes attached to her. Doe described her attacker as "Asian looking," in the first interview, but not specifically Asian, and as "possibly mixed" in a second interview, six weeks later, on April 1, 2012. She reported in the first interview that the man asked for money, but had not attacked her until she walked on further, turned around and headed home, passing him again. In the second interview, she said that she refused to give him money because she only had bus fare and he attacked her immediately, striking her on the head.

Lieutenant Gard explained Doe still had large memory gaps at the time of the second interview, and some questions had to be explained to her multiple times before she showed any signs of comprehension. It was not a successful interview from an investigative perspective, but there were no other leads. There were responses that just did not add up. For example, she described her assailant as her son's age, but then said that age was 19, even though her sons were in their fifties.

*2. Trial Court Ruling*

The trial court ruled that Doe's pretrial description of her attacker was inadmissible on the grounds that it was unreliable and untrustworthy. The court explained: "[I]t is clear from the testimony of her daughter and Lieutenant Gard, as well as the medical records submitted, that [Doe] suffered significant injuries, including head trauma. There is no dispute that she was in a coma for a period of time. She never fully recovered from her injuries as she lived out the remainder of her life in various medical treatment and rehabilitation centers before passing away." The court noted that Doe's condition after the attack contrasted from her daughter's description of her as "mentally sharp and physically active" before the attack. Medical records showed she sustained a subarachnoid hemorrhage and described her as "disoriented and confused" and noted that, at one point, she was confused about the year and suffering from "cognitive impairment."

Although the court expressed some concern about the timeliness of the April 1 interviews, it explained that most cases discuss the "timeliness" issue in terms of an "opportunity to reflect and fabricate," but here: "[Doe] was unavailable to law enforcement and medical personnel for weeks in terms of describing the injury. [¶] . . . [T]his time lapse did not give her time to fabricate a story, as she was comatose for a period of time and unable to speak with anyone. There is no evidence to suggest [Doe] had any motive to fabricate a story or to lie about what she recalled in terms of the attack."

*3. Applicable Law and Standard of Review*

Pursuant to Evidence Code section 1370, subdivision (a), a hearsay statement that "purports to narrate, describe, or explain the infliction or threat of physical injury upon the declarant" is not made inadmissible by the hearsay rule if the following conditions are met: (1) the witness was

15

unavailable; (2) the statement was made at or near the time the injury was inflicted; and (3) the circumstances under which the statement was made indicate its trustworthiness. The issue in this case turns on whether Doe's statements could be deemed trustworthy.

"Broadly speaking, an appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence." (*People v. Waidla* (2000) 22 Cal.4th 690, 717.) The parties disagree about the proper standard of review. Jackson exhaustively advocates for an independent review, while the People, without responding to Jackson's argument, assert, in a single sentence, that the appropriate standard of review is abuse of discretion.

Jackson relies on cases that have independently reviewed questions of trustworthiness in other contexts. (See, e.g., *People v. Cromer* (2001) 24 Cal.4th 889, 898-901 (*Cromer*) [de novo review of prior recorded statement under Evid. Code, § 1291]; *People v. Kons* (2003) 108 Cal.App.4th 514, 524 [independently reviewing trustworthiness of hearsay statement under Evid. Code, § 1370 for confrontation clause purposes]; *People v. Tatum* (2003) 108 Cal.App.4th 288, 296 [independently reviewing trustworthiness finding for hearsay statement of unavailable elder abuse victim under Evid. Code, § 1380]; *People v. Robert V.* (2001) 93 Cal.App.4th 1350, 1374 [same for hearsay statement describing child abuse under Evid. Code, § 1360].)

Jackson cites *Cromer* for the proposition that whether a witness's out-of-court statement is "trustworthy"—for the purposes of assessing whether it qualifies as a hearsay exception—poses a mixed question of law and fact to which the independent standard of review has been found to apply. *Cromer, supra,* 24 Cal.4th at page 898, citing *Lilly v. Virginia* (1999) 527 U.S. 116, 136, explains: "[A]s with other fact-intensive, mixed questions of

16

constitutional law, . . . '[i]ndependent review is . . . necessary . . . to maintain control of, and to clarify, the legal principles' governing the factual circumstances necessary to satisfy the protections of the Bill of Rights.' " The instant case, however, does not involve a question of constitutional law. Rather, the issue is the admissibility of Doe's statements under the normal rules of evidence to which we apply the abuse of discretion standard.

    *4.    Analysis*

Jackson challenges the court's finding that Doe's statements to Lieutenant Gard were not "made under circumstances that would indicate its trustworthiness." (Evid. Code, § 1370, subd. (a)(4).) Circumstances relevant to a finding of trustworthiness "include[] but are not limited to[ ] the following: (1) Whether the statement was made in contemplation of pending or anticipated litigation in which the declarant was interested. [¶] (2) Whether the declarant has a bias or motive for fabricating the statement, and the extent of any bias or motive. [¶] (3) Whether the statement is corroborated by evidence other than statements that are admissible only pursuant to this section." (Evid. Code, § 1370, subd. (b).) As the statutory language makes clear, these factors are not exhaustive.

As the trial court noted, Doe had suffered significant injuries, including head trauma, and she was in a coma following the assault. Doe's condition after the attack was in contrast to her daughter's description of her as being "mentally sharp and physically active" *before* the attack. Medical records showed she sustained a subarachnoid hemorrhage and described her as "disoriented and confused" and noted that, at one point, she was confused about the year and was suffering from "cognitive impairment."

Jackson argues that the trial court erroneously focused on Doe's mental condition and did not adequately consider that Doe had no reason to lie and

17

that her statements were otherwise corroborated by Jackson. Certainly, as the trial court noted, there is nothing in the record to suggest that Doe had a motive to lie about the identity of her attacker. However, we disagree that Doe's statements describing someone other than Jackson as the perpetrator were corroborated by Jackson's self-serving testimony that when he found Doe she was already beaten and unconscious. The record reflects that Doe's perception of reality and ability to recall facts from the past was not reliable based on her severe head trauma. Following the attack, Doe was in a coma for a few weeks and was in a semiconscious state when she made the statements, which were equivocal at best, about the identity of her attacker.

In sum, the trial court did not abuse its discretion in excluding Doe's statements.

## B. Causation Evidence

Jackson contends his murder conviction must be reversed because there is insufficient evidence that the assault was the cause of Doe's death. We disagree.

### 1. *Applicable Law and Standard of Review*

A homicide conviction requires proof that the defendant's conduct proximately caused the victim's death. (*People v. Butler* (2010) 187 Cal.App.4th 998, 1009.) " 'To be considered the proximate cause of the victim's death, the defendant's act must have been a substantial factor contributing to the result, rather than insignificant or merely theoretical.' " (*People v. Jennings* (2010) 50 Cal.4th 616, 643.) A substantial factor is one that is more than an " 'insignificant or merely theoretical' " factor. (*Ibid.*)

" '[A]s long as the jury finds that without the criminal act the death would not have occurred when it did, it need not determine which of the concurrent causes was the principal or primary cause of death.' " (*People v.*

*Jennings, supra,* 50 Cal.4th at p. 643, quoting *People v. Catlin* (2001) 26 Cal.4th 81, 155 (*Catlin*).) "This is true even if the victim's preexisting physical condition also was a substantial factor in causing death." (*Catlin, supra,* at p. 155.) " 'So long as a victim's predisposing physical condition, regardless of its cause, is not the *only* substantial factor bringing about his [or her] death, that condition . . . in no way destroys the [defendant's] criminal responsibility for the death.' " (*Ibid.*)

A jury's finding of proximate causation will not be disturbed on appeal if there is substantial evidence—evidence that is reasonable, credible, and of solid value—from which it may be reasonably inferred that the defendant's act was a substantial factor in producing death. (*People v. Butler, supra,* 187 Cal.App.4th at p. 1010.) On appeal, we do not reweigh the evidence or determine credibility issues; " ' " '[i]f the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.' " ' " (*Catlin, supra,* 26 Cal.4th at p. 139.)

### 2.     *Analysis*

To support his challenge to the jury's causation finding, Jackson attempts to reargue the evidence in an effort to discredit the testimony of the prosecution's medical expert that the assault contributed to the pneumonia that caused Doe's death. Jackson challenges the three factors the expert relied on in linking the assault to the pneumonia as speculative, to wit: (1) the cancerous tumor contributed to the pneumonia because Doe could not be treated due to the injuries inflicted by the assault; (2) the brain trauma from the assault resulted in dysphagia (difficulty swallowing), which led to aspiration of foreign material in the lungs, which triggered the pneumonia;

and (3) Doe's prolonged hospitalization due to her injuries caused by the assault made her more susceptible to pneumonia.

As set forth above, when there are multiple concurrent causes of death, the jury is not required to determine which, if any, cause was the primary cause. Rather, the jury need only determine that the defendant's conduct was a substantial factor contributing to the death. (*People v. Jennings, supra,* 50 Cal.4th at p. 644 [jury could reasonably find defendant's torture was substantial factor in causing death even though expert testified that death was attributable to several factors " '*all working together*' " to bring about the death]; *Catlin, supra,* 26 Cal.4th at p. 155.)

The record supports the finding that Jackson engaged in conduct that substantially contributed to Doe's death. Witness testimony indicated that prior to the attack Doe was a vibrant, active, and otherwise healthy 81-year old, who was in no danger of getting pneumonia, let alone dying from it. Drawing all inferences in favor of the judgment (*People v. Zamudio* (2008) 43 Cal.4th 327, 357), we assume the jury found Jackson committed the assault that required her hospitalization and contributed to her weakened condition which precipitated the pneumonia. The fact that numerous factors could have also contributed to the pneumonia does not relieve Jackson of his criminal liability for the chain of events he set in motion when he brutally and savagely attacked Doe.

## C.    Object Penetration Evidence

Jackson was charged with and convicted of forcible rape (Pen. Code, § 261)[4] and forcible sexual penetration by a foreign object (§ 289). Jackson argues there is insufficient evidence of penetration distinct from the rape.

_____

[4] All further statutory references are to the Penal Code unless otherwise indicated.

Specifically, Jackson claims there is no evidence that Doe was sexually penetrated by something other than a penis and, as such, he cannot be convicted of both offenses.

### 1. *Applicable Law and Standard of Review*

To prove Jackson was guilty of committing forcible rape in violation of section 261, the People were required to prove Jackson had non-consensual "sexual intercourse" with Doe. (§ 261, subd. (a)(2); CALCRIM No. 1000.) "*Sexual intercourse* means any penetration, no matter how slight, of the vagina or genitalia by the penis" (CALCRIM No. 1000; *People v. Karsai* (1982) 131 Cal.App.3d 224, 234, disapproved on other grounds by *People v. Jones* (1988) 46 Cal.3d 585, 600, fn. 8.)

To prove Jackson was guilty of committing sexual penetration by force, in violation of section 289, the People were required to prove that: (1) defendant committed an act of sexual penetration with another person; (2) the penetration was accomplished by using a foreign object, or substance, instrument, device, or unknown object; (3) the other person did not consent to the act; and (4) defendant accomplished the act by force, violence, duress, menace, or fear of immediate and unlawful bodily injury to another person. (§ 289, subd. (a)(1)(A); CALCRIM No. 1045.) Section 289 defines a foreign object, substance, instrument, or device as including any part of the body *except* a sexual organ. (§ 289, subd. (k)(2).) A penis can be an unknown object only if it is not known what object actually penetrated the opening. (*Id.*, subd. (k)(3); CALCRIM No. 1045.)

Sexual penetration may be established by circumstantial evidence as well as by way direct evidence. (*People v. Stevenson* (1969) 275 Cal.App.2d 645, 650; *People v. Strickland* (1955) 134 Cal.App.2d 815, 818.) In particular, the jury may rely upon the condition of the victim's vagina to conclude

21

penetration occurred. (See *People v. Edwards* (2013) 57 Cal.4th 658, 716717 [injuries to victim's vaginal and rectal areas consistent with penetration by mousse can found on bed]; see also *People v. Holt* (1997) 15 Cal.4th 619, 669 ["The jury verdict in this case was not, as defendant argues, based only on speculation. It was based on evidence the redness present in the victim's vagina was consistent with penetration by an adult male penis."].)

In considering a claim of insufficiency of evidence, a reviewing court must determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' (*Jackson v. Virginia* (1979) 443 U.S. 307, 319; *People v. Marshall* (1997) 15 Cal.4th 1, 34; *People v. Johnson* (1980) 26 Cal.3d 557, 578.) Where, as here, the jury's findings rest to some degree upon circumstantial evidence, we must decide whether the circumstances reasonably justify those findings, 'but our opinion that the circumstances also might reasonably be reconciled with a contrary finding' does not render the evidence insubstantial. (*People v. Proctor* (1992) 4 Cal.4th 499, 528–529.)" (*People v. Earp* (1999) 20 Cal.4th 826, 887888.)

Substantial evidence is evidence that is "reasonable, credible, and of solid value." (*People v. Johnson, supra,* 26 Cal.3d at p. 578.) Reasonable inferences may be made from substantial evidence. But inferences " ' "may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work." ' " (*People v. Raley* (1992) 2 Cal.4th 870, 891.)

2.    *Analysis*

Insisting a single penetration formed the basis for both the rape (count 3) and sexual penetration by a foreign or unknown object (count 4) charges, Jackson contends he cannot be convicted of both offenses. The People

contend there is substantial evidence of two separate penetrations. We agree.[5]

Some of the usual ways of proving penetration could not be utilized in this case. Because she had no memory of the sexual assault, there is no testimony from Doe regarding the number of times she was penetrated or the manner in which she was penetrated. (See *People v. Thomas* (1986) 180 Cal.App.3d 47, 54, 56 [victim's testimony that it hurt when defendant pushed his penis against her anus supported a factual finding of slight penetration].) However, there is circumstantial evidence suggesting at least two penetrations occurred based on the physical condition of Doe's body. Specifically, Jackson's semen found in Doe's vagina was circumstantial evidence that he raped Doe. (See *People v. Sanchez* (2016) 246 Cal.App.4th 167, 176-177.) Additionally, Jackson, himself, admitted that he used a finger to sexually penetrate Doe without her consent. Nevertheless, the prosecution did not argue that count four was based on digital penetration. Similarly, expert testimony suggested that a single finger could not have caused the significant injuries Doe sustained. Other evidence suggested the injuries could have been caused by an "instrument or a body part," which could have been a penis or some type of "hard blunt object."

*People v. Holt, supra,* 15 Cal.4th 619 presents a somewhat analogous situation. There, the defendant was convicted of sodomizing, raping and murdering the victim. (*Holt,* at pp. 638-639.) There were no witnesses to the

---

[5] By reason of this conclusion, we need not address the People's alternate claim that one penetration could support two convictions. (See *People v. White* (2017) 2 Cal.5th 349, 351 [defendant could be convicted of both rape of an intoxicated person and rape of an unconscious person]; *People v. Gonzalez* (2014) 60 Cal.4th 533, 535 [defendant could be convicted of both oral copulation of an intoxicated person and oral copulation of an unconscious person].)

actual crime and the victim died at the hospital without ever regaining consciousness. (*Id.* at p. 641.) At trial, the emergency room doctor who examined the victim when she was brought to the hospital testified that the victim's "vaginal area was red and that this could be consistent with either bruising and penetration by an adult penis or an infection." (*Id.* at p. 668.) The defendant argued that the evidence was insufficient to support his rape conviction, because "the redness could have been caused by any low-grade infection or atrophic vaginitis for which one of the medications the victim was taking is sometimes prescribed. This, coupled with the finding of apparent blood in the anus, suggested that if a sexual assault took place only sodomy occurred." (*Ibid.*) Our Supreme Court affirmed the conviction on the rape charge, explaining: "That the evidence might lead to a different verdict does not warrant a conclusion that the evidence supporting the verdict is insubstantial. (*People v. Berryman* (1993) 6 Cal.4th 1048, 1084.)" (*Holt,* at p. 669.)

Here, aside from Jackson's admission of digital penetration, the evidence of object penetration was circumstantial. Blunt force trauma to Doe's vagina, the absence of an object found at the scene, and expert testimony that a finger could not have caused the extensive injuries support the possibility that the penetration resulted only from defendant's penis, which would not constitute a foreign object under section 289. (§ 289, subd. (k)(2).) However, other circumstantial evidence—the blunt force trauma that lacerated Doe's vagina and ruptured her internal organs, causing her bowels to protrude into her vagina and expert testimony that the injuries could have been caused by a "hard blunt object"—supports the inference that the extensive trauma had a different cause. That the object was never identified or located does not mean the jury verdict was based on speculation. Given

24

Doe's extensive injuries, which required surgical repair and which were described as the "worst" the examining nurse had ever seen in in her 36-year career, the inference that Jackson penetrated Doe with a foreign or unknown object, is reasonable.

## D.    Prosecutorial Misconduct

Jackson argues the prosecutor committed misconduct by misstating the law regarding sexual penetration under section 289. He further contends the prosecutor impermissibly argued defense counsel did not believe in Jackson's innocence and conspired with Dr. Melinek to present a sham defense.  The People assert that Jackson failed to preserve his first claim, and even if preserved, the claim of error regarding the elements of forcible penetration under section 289 fails on the merits. The People further assert that there was no prejudicial misconduct in pointing out the weaknesses in the defense case, and any such error did not prejudice Jackson.

### 1.    *Applicable Law*

"When a prosecutor's intemperate behavior is sufficiently egregious that it infects the trial with such a degree of unfairness as to render the subsequent conviction a denial of due process, the federal Constitution is violated. Prosecutorial misconduct that falls short of rendering the trial fundamentally unfair may still constitute misconduct under state law if it involves the use of deceptive or reprehensible methods to persuade the trial court or the jury." (*People v. Panah* (2005) 35 Cal.4th 395, 462.) "Misconduct that does not constitute a federal constitutional violation warrants reversal only if it is reasonably probable the trial outcome was affected." (*People v. Shazier* (2014) 60 Cal.4th 109, 127.)

"As a prerequisite for advancing a claim of prosecutorial misconduct, the defendant is required to have objected to the alleged misconduct and

25

requested an admonition 'unless an objection would have been futile or an admonition ineffective.' " (*People v. Jablonski* (2006) 37 Cal.4th 774, 835.) " ' "To prevail on a claim of prosecutorial misconduct based on remarks to the jury," ' " there must appear " ' "a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner." [Citation.] "Prosecutors have wide latitude to discuss and draw inferences from the evidence at trial. [Citation.] Whether the inferences the prosecutor draws are reasonable is for the jury to decide." ' " (*Ibid.*)

2.      *Representation of the Law Regarding Sexual Penetration*

During his initial closing argument, the prosecutor, when explaining the forcible penetration count under section 289, told the jury: "Forcible penetration in Count 4. Ladies and gentlemen, the defendant is charged with this because of the damage he did to [Doe's] vagina. It is clear that he ripped her insides to shreds. You heard . . . the SART nurse testify that [it] could have been his penis. He also may have used something else. But he is charged with this count because when somebody does the amount of damage Mr. Jackson did to [Doe], he's also to be found guilty of forcible penetration by a foreign object. And that object can also be his penis as is specified in the law."

On appeal, Jackson argues the prosecutor misstated the law by suggesting that the jury could find both rape and sexual penetration by foreign/unknown object based on the same penile penetration. He concedes his trial counsel did not object to the prosecutor's representation of the law, but maintains we, as an appellate court, are "free to address the merits" of this otherwise forfeited claim. (See, e.g., *People v. Williams* (1998) 17 Cal.4th 148, 161162, fn. 6.) Alternately, he argues defense counsel was ineffective for failing to object the prosecutor's representation of the law.

Because we conclude any misstatement of the law of sexual penetration was harmless we dispense with the forfeiture and ineffective of assistance claims and proceed to the merits. The worst that can be said about prosecutor's fleeting reference that a penis could be considered an unknown object was that it was misleading. Although the prosecutor's statement was a correct statement of law (a penis can be considered an unknown object [§ 289, subd. (k)(3)]), it was confusing to the extent it suggested the prosecutor was relying on the rape to also prove sexual penetration by a foreign or unknown object based on the same penetration. However, as discussed, substantial evidence supports Jackson's convictions for rape and object penetration based on two penetrations. Moreover, as Jackson concedes, the trial correct correctly instructed the jury with on the law.

Accordingly, we conclude the prosecutor's remarks did not result in a fundamentally unfair trial or raise a reasonable probability of a more favorable result absent the challenged comment. (*People v. Shazier, supra,* 60 Cal.4th at p. 127.)

3.      *Comments About the Strength of the Defense*

Jackson argues the prosecutor committed misconduct by expressly and implicitly arguing to the jury that defense counsel did not believe in his client's innocence, and in fact believed in his guilt, and conspired with Dr. Melinek to present a sham defense. The challenged statements fall into three categories: (1) counsel did not retest evidence because he knew his client was guilty; (2) counsel was desperate to promote falsehoods and insincere in his defense of Jackson because he did not believe in his client's innocence; and (3) counsel paid Dr. Melinek to provide false testimony based in part on a misrepresentation of medical records.

27

### a. Failure to Retest Evidence

During his initial closing argument, the prosecutor noted there had been "some cross-examination of the DNA analyst" but defense counsel never had any of the samples, which were preserved, retested. Then the prosecutor said, "if . . . there's any desire to actually learn, if there was a third party, a mystery man that attacked [Doe], all of that evidence is available for retesting." Defense counsel objected, and the trial court overruled the objection.

During his rebuttal argument, the prosecutor noted the defense's failure to retest certain evidence, stating "the defense showed they could do that if they wanted to do that. They had Dr. Melinek retest preserved items. *Why would you retest preserved items but not retest items that prove who the mystery attacker is unless you did it?*" (Italics added.) Defense counsel objected again, and the objection was overruled.

### b. Desperation and Insincerity

The prosecutor argued there was "no credible evidence" that Doe was not living independently before the incident. When referring to a question by *"the defense attorney in this case"* regarding whether knowingly walking dangerous streets in the mornings said anything about Doe's cognitive impairment, the prosecutor said, "That is . . . the *height of desperation.*" (Italics added.) The comment elicited a defense objection, which was overruled. Later, the prosecutor referenced "enumerable *attempts by the defense* to show you that Doe was not in good health . . . [e]*ach more desperate than the next.*" (Italics added.) Defense counsel again objected, and the court overruled it.

After attempting to discredit Dr. Moser, the prosecutor asked, "Why did they have to call him?" The prosecutor then answered his own question,

28

stating, "It was necessary to call Dr. Moser because *the defense knows that defendant Jackson's testimony standing on its own is completely unbelievable.*" (Italics added.) That comment also elicited a defense objection, which the court overruled.

Responding to defense counsel's argument citing what he claimed were reasonable explanations for Doe ending up in the alcove other than kidnapping, the prosecutor argued: "The *same defense attorney* who stood in front of you moments ago and told you to put on your scientific glasses and told you to critically evaluate the evidence, asked you consider the possibility that [Doe] standing 80 feet from the back of that alley dropped a quarter, it defied gravity and physics, rolled all the way uphill and that's why she was in the back of that alley . . . . *That is the sincerity, that is the quality of the argument presented to by the defense in this case.*" (Italics added.) After the trial court overruled defense counsel's objection, the prosecutor added, "It is a snapshot, *a complete picture of the sincerity of what was presented to you here by the defense.*" (Italics added.) Again defense counsel objected, and again the trial court overruled it.

### c. Sham Defense

When commenting about the defense theory that Doe might have suffered from cognitive defects because she went for walks every morning even though her family told she should stop because it was dangerous, the prosecutor argued, "That was an absolute reach because they are wanting to do anything, anything they can, pay an expert $11,000, get a set of scripted questions, doctor the medical reports, anything, anything to get you to believe that somehow before January 28, 2012 [Doe] was not in good health." In response to defense counsel's objection, the trial court directed the jury to disregard the reference to doctored records but permitted the rest of the

29

argument. The prosecutor followed up by telling the jury, "Dr. Melinek tried to submit records to you that were inaccurate." Defense counsel's objection was again overruled.

The prosecutor then argued that Doe suffered a traumatic brain injury as a result of the attack and that her throat cancer, which Dr. Melinek cited asthe sole cause of death, could not explain all her symptoms. The prosecutor said, "That is an absolutely ridiculous proposition. No matter how hard *Dr. Melinek tried to sell you* or how *scripted* she wanted that *testimony* to be." (Italics added.) Again, counsel objected, but it was overruled.

During his rebuttal argument, the prosecutor referenced the inaccurate quote in Dr. Melinek's slide presentation, adding: "And then *there was a cover job* the next day to try and give her the right thing." (Italics added.) Defense counsel's objection to that comment was once again overruled. The prosecutor further argued: "You heard *when they talked on redirect and he gave her the report* and said, oh, it must have been the non-Bates stamp" version. (Italics added.)

### d. Analysis

As official representatives of the people, prosecutors have a duty to be reasonably objective in their closing statements. (*People v. Talle* (1952) 111 Cal.App.2d 650, 677.) A prosecutor may properly comment "upon the failure of the defense to introduce material evidence." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1339.) However, it is misconduct for a prosecutor to argue "defense counsel knew his client was guilty." (*People v. Seumanu* (2016) 61 Cal.4th 1293, 1338.)

"A prosecutor commits misconduct if he or she attacks the integrity of defense counsel, or casts aspersions on defense counsel." (*People v. Hill* (1998) 17 Cal.4th 800, 832.) Our Supreme Court has rejected a claim of prosecutorial

misconduct where the prosecutor observed during closing remarks that " 'any experienced defense attorney can twist a little, poke a little, try to draw some speculation, try to get you to buy something,' " finding this did not "amount to a personal attack on counsel's integrity." (*People v. Medina* (1995) 11 Cal.4th 694, 759.) On the other hand, "[i]t is improper for the prosecutor to imply that defense counsel has fabricated evidence or to otherwise malign defense counsel's character." (*People v. Herring* (1993) 20 Cal.App.4th 1066, 1075 (*Herring*).)

Contrary to the People's claim, there is a reasonable likelihood the jury would have viewed the prosecutor's remarks as implying that defense counsel did not believe in his client's innocence as evidenced by the failure to retest the DNA evidence and by putting forth an insincere and sham defense. It does not matter that the prosecutor may not have expressly referred to defense counsel but rather only "the defense." Merely implying such knowledge by defense counsel is still misconduct. (*People v. Seumanu, supra*, 61 Cal.4th at p. 1338.) Moreover, while a "prosecutor may vigorously challenge the validity of any defense, and can characterize the testimony of a witness . . . as untruthful," it is misconduct "to state or imply that defense counsel has fabricated a defense." (*Id.* at p. 1337.) Here, the prosecutor did not simply argue that the defense was unsupported by the evidence or that Dr. Melinek's opinion was controverted, flawed, or not worthy of consideration. He argued that the defense expert tried to "sell" the jury on "scripted" testimony that was inaccurate, and when discovered, "there was cover job" on "redirect." Again, the fact that the prosecutor did not expressly refer to defense counsel did not lessen the impact. When talking about "redirect" it is implicit that the prosecutor was referring to defense counsel.

Nevertheless, we conclude any misconduct that occurred was not prejudicial. Rarely do a prosecutor's personal attacks on defense counsel amount to reversible misconduct. (*People v. Taylor* (2001) 26 Cal.4th 1155, 1167.) Prosecutorial misconduct requires reversal under the federal Constitution when it infects the trial with such unfairness as to make the resulting conviction a denial of due process. (*People v. Williams* (2013) 56 Cal.4th 630, 671.) Misconduct not rising to this level is reviewed for prejudice under state law—we consider "whether it is reasonably probable that a jury would have reached a more favorable result absent the objectionable comments." (*Ibid.*; *Herring, supra*, 20 Cal.App.4th at p. 1074.) As we explain, the error here was harmless under any standard. The prosecutor's remarks did not result in a fundamentally unfair trial or raise a reasonable probability of a more favorable result absent the challenged comments.

Any misconduct from the challenged comments was no more prejudicial than Jackson's own testimony. Jackson's version of the events would be hard for any jury to believe. He came upon what he thought was a dead body, had a moment of necrophilia, masturbated, and then, using his hands, put his semen into Doe's vagina. The prosecutor appropriately highlighted the absurdity of the defense theory. (See *People v. Lawley* (2002) 27 Cal.4th 102, 156 [fair comment for the prosecutor to describe defense evidence as a "total farce" and "ludicrous"].)

Moreover, the trial court instructed the jury that comments by the attorneys were not evidence (CALCRIM Nos. 104, 222) and that the jury alone had to decide what happened based solely on the trial evidence (CALCRIM No. 200). These instructions further minimized any prejudice from the prosecutor's closing remarks. (See, e.g., *People v. Smith* (2005) 135 Cal.App.4th 914, 925; *People v. Loker* (2008) 44 Cal.4th 691, 739.) On this

record, any prosecutorial misconduct during closing argument was patently harmless.

### E. Cumulative Error

We have determined that Jackson has failed to identify any single prejudicial error in the proceedings below. We similarly conclude that no cumulative error requiring reversal has been shown. "Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial." (*In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32.) "In examining a claim of cumulative error, the critical question is whether defendant received due process and a fair trial." (*People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1068.) Even assuming one or more errors occurred in the trial court proceedings as discussed herein, our review of the record assures us that Jackson received due process and a fair trial. (Compare *People v. Bradford, supra,* 15 Cal.4th at. p. 1382 [finding no cumulative error where the court found no individual prejudicial error and, "[e]ven considered collectively, the errors were not significant"].)

### F. Parole Revocation Fine

Jackson argues, and the People agree, that in light of his life without the possibility of parole (LWOP) sentence, the parole revocation fine must be stricken. The parties are correct.

Section 1202.45, subdivision (a) requires a sentencing court to assess a parole revocation fine "[i]n every case where a person is convicted of a crime and his or her sentence includes a period of parole." Because Jackson was sentenced to life without the possibility of parole, and the sentences on his indeterminate terms in counts 2 through 4 were stayed, the suspended parole revocation fine is unauthorized and must be stricken. (*People v. Carr* (2010) 190 Cal.App.4th 475, 482 & fn. 6; see generally *People v. McWhorter* (2009) 47

Cal.4th 318, 380 [parole revocation fine cannot be imposed on an LWOP sentence]; *People v. Brasure* (2008) 42 Cal.4th 1037, 1075 [parole revocation fine must be imposed despite LWOP or death sentence where un-stayed determinate terms are imposed].)

## G. Felony-murder Special-circumstances Rule

In addition to finding Jackson guilty of first degree murder, the jury found true the special circumstances allegations that the murder was committed during the commission of a rape (§§ 190.2, subd. (a)(17)(C), 261) and sexual penetration by a foreign object (§§ 190.2, subd. (a)(17)(K), 289). Pursuant to the special circumstances findings, the trial court sentenced Jackson to an LWOP sentence.

Jackson contends the felony-murder special-circumstances law fails to narrow the class of murders eligible for enhanced punishment in violation of the Eighth Amendment because there is no difference between the proof required to establish guilt under the felony murder rule and that required to subject Jackson to punishment under the felony murder special circumstances. We disagree.

The United States Supreme Court has held that state sentencing guidelines must, pursuant to the Eighth Amendment, distinguish between those persons eligible for sentencing to death and those who are not. (*Zant v. Stephens* (1983) 462 U.S. 862, 877 [For an aggravating sentencing factor to pass constitutional muster, it "must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the Jackson compared to others found guilty of murder."].) As relevant in this case, section 190.2 defines as a special circumstance any murder "committed while the defendant was engaged in . . . the commission of" certain enumerated felonies, including "[r]ape in violation

34

of Section 261" (§ 190.2, subd. (a)(17)(C)) and "[r]ape by instrument in violation of Section 289." (*Id.*, subd. (a)(17)(K).) Section 189, subdivision (a) defines first degree murder to include any "murder . . . that is committed in the perpetration of," inter alia, "rape . . . or any act punishable under . . . Section 289.")

Jackson argues that because the elements of both the felony murder substantive offense and the felony murder special circumstance are identical, section 190.2 fails to adequately circumscribe the class of persons eligible for the enhanced penalty from other murderers where the special circumstance duplicates all the elements of, and includes no elements in addition to, the substantive offense.

Jackson, however, was not sentenced to death, rendering the "narrowing" rule inapplicable. A sentence of life without the possibility of parole, while undoubtedly grave, "remains fundamentally different from death in the one respect so often emphasized in Eighth Amendment jurisprudence: time and again the high court opinions reason that capital punishment is 'final' and 'irrevocable' in the obvious sense that after it is carried out there is no possibility of rehabilitation, clemency, or belated relief because of factual mistake or change in the law." (*People v. Zimmerman* (1984) 36 Cal.3d 154, 158.) As the court noted in *People v. Banks* (2015) 61 Cal.4th 788, 804, "As a purely constitutional matter, nothing would foreclose California from imposing life imprisonment without parole sentences on felony murderers with [defendant's] degree of culpability." (Citing *People v. Estrada* (1995) 11 Cal.4th 568, 575 [" 'reckless indifference to human life' " is not constitutionally required for a life imprisonment without parole sentence]; *People v. Johnson* (2010) 183 Cal.App.4th 253, 296, 299 [rejecting

an Eighth Amendment challenge to a life imprisonment without parole sentence for a robbery-murder getaway driver].)

Contrary to Jackson's contention, the overlap of the felony-murder special-circumstances law and the felony-murder theory of first degree murder does not demonstrate a constitutional infirmity in his sentence. Recently, in *People v. Wilkins* (2021) 68 Cal.App.5th 153, an appellate court rejected a similar claim, explaining the felony-murder special-circumstance statute was sufficiently narrow because "[i]t makes a subclass of murderers—first degree felony murderers—death eligible . . . [and] does not apply to other murderers such as second degree murderers or simple murderers." (*Id.* at p. 165.) Therefore, "[b]ecause the statute renders a mere subset of murderers eligible for the death penalty, it sufficiently narrows the overall class of murderers as required by the Eighth Amendment." (*Ibid.*) Lastly, it is not problematic that the elements of first degree felony murder are identical to the elements defining death eligibility under the felony-murder special-circumstance statute. (See *People v. Johnson* (2016) 62 Cal.4th 600, 636 [holding that overlapping culpability and special circumstance elements—even identical ones—do not offend the Eighth Amend.]; *Catlin, supra,* 26 Cal.4th at p. 158 ["first degree murder liability and special circumstance findings may be based upon common elements without offending the Eighth Amendment"]; see also *Lowenfield v. Phelps* (1988) 484 U.S. 231, 246 ["the fact that the aggravating circumstance duplicate[s] one of the elements of the crime does not make [the] sentence constitutionally infirm"].)

Accordingly, there is no constitutional infirmity in Jackson's LWOP sentence.

## III. DISPOSITION

The parole revocation fine imposed pursuant to section 1202.45 is stricken. As so modified, the judgment is affirmed. The superior court is directed to prepare an amended abstract of judgment striking the parole revocation fine and to serve all appropriate agencies to reflect this change.

NADLER, J.*

WE CONCUR:

STREETER, Acting P. J.
BROWN, J.

---

* Judge of the Superior Court of California, County of Sonoma, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.